**Conrad HARTWIG and Donald Stricker, on their own behalf and on behalf of all persons similarly situated**

**v.**

**The UNITED STATES.**

**No. 177–72.**

United States Court of Claims.

Oct. 17, 1973.

---

James D. Hutchinson, Washington, D. C., for plaintiffs. Robert P. Chaloupka, Scottsbluff, Neb., attorney of record for plaintiffs. Van Steenberg, Brower & Chaloupka, Scottsbluff, Neb., Michael J. Malley, and Steptoe & Johnson, Washington, D. C., of counsel.

John E. Lindskold, Washington, D. C., with whom was Asst. Atty. Gen. Wallace H. Johnson, for defendant.

Before COWEN, Chief Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA, KUNZIG and BENNETT, Judges.

### ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT *

BENNETT, Judge.

The plaintiffs in this taking case are the owner and lessee, respectively, of a tract of land located along the North

---

\* This case is also before the court on the following motions: plaintiffs' motion to strike the affidavit of Alfred L. Chase, attached as an appendix to defendant's brief; plaintiffs' motion for the court to determine this action as a proper class action; and plaintiffs' motion to waive the filing fee.

Platte River in Scotts Bluff County, Nebraska. The river is a non-navigable stream. The plaintiffs are alleging, on their own behalf and on behalf of others similarly situated, that the operation of a series of dams along the North Platte River by the Army Corps of Engineers and the Bureau of Reclamation, Department of Interior, during the months of March through June 1971, caused extensive flooding on the river, extending over more than 100 acres of plaintiffs' land, resulting in the permanent destruction of over 35 acres of the plaintiffs' property by erosion and the deposit of large quantities of sand and silt. It is also claimed that plaintiffs suffered the destruction of fences, irrigation ditches and other improvements on the land and equipment thereon. On this basis the plaintiffs contend that the actions of the defendant's agents in operating the dams constituted a taking of their property rights for which they are now seeking just compensation under the Fifth Amendment. It is concluded, based on the facts considered in the light most favorable to the plaintiffs, that as a matter of law the claimants are not entitled to recover.

The plaintiffs' motions to convert this cause into a class action, to include, as plaintiffs, all the riparian landowners, approximately 1000, owning land located along the North Platte River between the Glendo Reservoir in Wyoming and the confluence of the North Platte and Missouri Rivers (a distance of approximately 500 miles), and to waive the filing fees for members of the class, and their motion to strike the affidavit accompanying the defendant's brief, will be discussed in the body of the opinion. The pertinent facts follow:

There are seven dams,[1] located in the State of Wyoming, that are run by the Bureau of Reclamation (hereinafter the Bureau) and are used to harness the waters of the North Platte River for the dual purposes of generating electricity

and collecting water for irrigation purposes. Of these dams, only the Glendo project has any capacity that can be allocated for flood control use [271,889 AF (acre-feet) out of a total capacity for Glendo of 795,196 AF]. It is clear that these dams were not constructed as flood control projects although they can be used to that end under certain circumstances. Their primary function is to store water, resulting from the spring snowmelt runoff, for distribution during the dry summer months to the various private irrigation districts in Wyoming and Nebraska, pursuant to contracts with those districts, state water rights, and a decree of the United States Supreme Court. Nebraska v. Wyoming, 325 U.S. 589, 665, 65 S.Ct. 1332, 89 L.Ed. 1815 (1945), modified, 345 U.S. 981, 73 S.Ct. 1041, 97 L.Ed. 1394 (1953).

During the winter of 1970–71, the precipitation in the North Platte Basin was 120–200 percent above the average for that time of year. It was the heaviest precipitation in 40 years. Forecasts of the runoff made at the beginning of March 1971 indicated that the inflows would exceed the irrigation requirements. This touched off discussions between officials of the Corps of Engineers and representatives of the States of Wyoming and Nebraska as to the best means of disposing of the excess runoff. Test releases were made on April 6 through 8 in order to test the capacity of the channels. It was at this time that a series of rainstorms, beginning in mid-April and ending during early June, compounded the problems. Major storms which occurred on April 18 and 26, May 5, 9–10, 22–23 and 29–30, and June 1–3 dropped large, unanticipated amounts of water in the basin, which contributed to the faster melting of the snow and greatly increased the volume of drainage into the reservoirs.

In a report issued by the Corps of Engineers in December of 1971, it was found that the records of flowage rates

---

1. Upstream from Casper, Wyoming, to downstream, in order, they are the Seminoe, Kortes, Pathfinder, Alcova and Gray Reef Dams (comprising the Upper System), and the Glendo and Guernsey Dams (the Lower System).

into the various reservoirs during the April-through-June period indicated that, if the dams had not been operational, there would have been two major floods at the time which would greatly have exceeded what in fact did occur. One flood would have peaked between May 5 and May 15 if measured at Mitchell, Nebraska; the other would have peaked at Mitchell during the first week in June. At their peaks, the flood waters would have been flowing at a rate of about 19,000 c.f.s. in channels able to absorb 7,000–9,000 c.f.s. under normal conditions without flooding. With the dams operating as they did, the flooding peaked at just under 12,000 c.f.s. It is understandable, therefore, that some flooding did occur in areas along the North Platte River below the Glendo Dam, but the operation of the reservoir system greatly reduced its severity.

In their petition and briefs, the plaintiffs contend that the maintenance of high levels of water in the various reservoirs during the winter months in question, prevented the Bureau and Corps of Engineers from utilizing some of the system's capacity to collect the enormous volume of rain that fell during the spring. Thus, plaintiffs argue that the absence of sufficient storage capacity, coupled with the unforeseen spring rains, resulted in releases from the reservoirs that were above normal, causing the floods in question. However, the plaintiffs are not contending that the Government agents acted negligently as the basis for their claim, since such a claim would clearly sound in tort and would, therefore, be outside this court's jurisdiction. 28 U.S.C. § 1491; Columbia Basin Orchard v. United States, 132 Ct. Cl. 445, 452, 132 F.Supp. 707, 710–711 (1955). Plaintiffs argue instead that the dams were properly operated, given their special purpose (*i. e.*, irrigation), but by being operated in this manner they were the cause of floods that were more severe and destructive than those which would have occurred if nature had been allowed to take its course. It is the defendant's interference with the normal flow of the river which the plaintiffs claim damaged their property, giving rise to a claim for just compensation under the Fifth Amendment.

■ As presented by the plaintiffs, this case involves several distinct problems which require discussion before a clear resolution of the case as a whole may be obtained. The preliminary problem involves the matter of the plaintiffs' motion to strike the affidavit which is contained as an appendix to the defendant's brief. The affidavit at issue is a certified copy of the Corps of Engineers report discussed *supra*. The plaintiffs contend that the report, prepared by Alfred L. Chase, Chief of the Reservoir Regulation Section, Hydrologic Engineering Branch, Engineering Division, Omaha District, Corps of Engineers, was not a product of personal knowledge and was replete with statements based on hearsay. Rule 101(f) of this court, in pertinent part, states:

> Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. * * *.

The plaintiffs contend that the Chase affidavit, made upon his "information and belief," clearly fails to meet the rule's standards and should, therefore, be properly stricken. McSpadden v. Mullins, 456 F.2d 428 (8th Cir. 1972).

The affidavit signed by Mr. Chase makes it clear that the report was not purely the product of the affiant's personal knowledge alone, and that it did contain statements of fact and conclusions that were based on hearsay, but this alone does not automatically preclude consideration of the report if it would otherwise be admissible in evidence at trial. 6 J. Moore, Federal Practice ¶ 56.22[1], at 2812 (2d ed. 1972). The purpose of the report, filed some 4 months prior to the institution of this suit, was to provide an official post-flood assessment as a basis for recommenda-

tions with respect to possible changes that might be made in the administration of the reservoir system in order to maximize future flood control effectiveness. In this case, where the report was prepared as part of the official duties of the affiant, and where the circumstances surrounding the preparation and issuance of the report furnishes considerable assurance of its reliability,[2] it would seem that the report itself should be admissible within the public documents exception to the hearsay rule, despite the author's lack of firsthand knowledge of all the facts reported. Such a conclusion in this case would serve to follow the modern trend toward admitting more official reports, including their findings of fact and final conclusions, in part prepared by the attesting official's subordinates, than might have been true in the past.[3] The Proposed Federal Rule of Evidence 803(8) (1973) broadens the official reports exception where there is sufficient indicia of trustworthiness surrounding the preparation of the report. Where it can be shown that the report was prepared as the result of an "investigation made pursuant to authority granted by law," then it would clearly fit the modern view of the public documents exception.[4] Yet, in this case it is unnecessary to ascertain whether this report fits an exception to the hearsay rule, since the plaintiffs' motion to strike may be disposed of on other grounds.

The plaintiffs' basic quarrel with the Chase report involves the conclusions contained therein. Such conclusions, based on records and statistics of the drainage in and out of the various reservoirs, were little more than expressions of expertise, normally admissible at trial as expert testimony. The plaintiffs' expert in his affidavit relies on the same figures in the report to reach conclusions that did not disagree with the Chase report findings, but merely expressed a view of how things would have been different if the dams had been operated in another fashion. The plaintiffs cannot move to strike the affidavit in toto and then seek to use the core of it to reinforce their own position. Such would seem to operate as a waiver of the motion to strike. At the very least, plaintiffs' objections must be considered as going more to the weight and credibility to be attached to the Chase affidavit than to its admissibility. There appears to be no good reason why the court should not be free to consider and to weigh the conclusions of the parties' two experts when both are basing their conclusions on the same basic facts. The plaintiffs' motion to strike is therefore denied.

Turning next to the merits of the plaintiffs' claim, it can be seen that the basic problem in this case is identical to that involved in most of the taking cases arising out of flood situations. "The essential inquiry is whether the injury to the claimant's property is in the nature of a tortious invasion of his rights or rises to the magnitude of an appropriation of some interest in his property permanently to the use of the Government." National By-Products, Inc. v. United States, 186 Ct.Cl. 546, 577, 405 F.2d 1256, 1273–1274 (1969).

■■ The law in this area is of vintage development, resulting in the establishment of certain well-defined principles. One of these is that the United States is not liable for all of the damages caused by a flooding unless directly attributable to governmental action. Indi-

---

2. Plaintiffs have not contended that the report was in any way prepared for litigation purposes. This is due probably to its submission well in advance of the filing of this case. Therefore, Palmer v. Hoffman, 318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943), would have no application here.

3. For example, *see* 5 Wigmore on Evidence §§ 1635, 1670–72 (3d ed. 1940).

4. Pekelis v. Transcontinental & Western Air, Inc., 187 F.2d 122 (2d Cir.), cert. denied, 341 U.S. 951, 71 S.Ct. 1020, 95 L.Ed. 1374 (1951); Moran v. Pittsburgh-Des Moines Steel Co., 183 F.2d 467 (3d Cir. 1950); Minnehaha County, S. D. v. Kelley, 150 F.2d 356 (8th Cir. 1945), are examples of the admission of evaluative reports similar to the one now at issue.

rect or consequential damages are not compensable. Danforth v. United States, 308 U.S. 271, 60 S.Ct. 231, 84 L.Ed. 240 (1939); Sanguinetti v. United States, 264 U.S. 146, 44 S.Ct. 264, 68 L.Ed. 608 (1924); John Horstmann Co. v. United States, 257 U.S. 138, 42 S.Ct. 58, 66 L.Ed. 171 (1921); National By-Products, Inc. v. United States, *supra*; R. J. Widen Co. v. United States, 174 Ct.Cl. 1020, 357 F.2d 988 (1966); North Counties Hydro-Elec. Co. v. United States, 108 Ct.Cl. 470, 70 F.Supp. 900 (1947), 138 Ct.Cl. 380, 151 F.Supp. 322, cert. denied, 355 U.S. 882, 78 S.Ct. 149, 2 L.Ed.2d 112 (1957), 170 Ct.Cl. 241 (1965); B Amusement Co. v. United States, 148 Ct.Cl. 337, 180 F.Supp. 386 (1960); Columbia Basin Orchard v. United States, *supra*. As a means of separating the direct injuries from those which are consequential, in cases in which the Government is alleged to have caused the flood damages, the courts have followed the principle long ago expressed in United States v. Cress, 243 U.S. 316, 37 S.Ct. 380, 61 L.Ed. 746 (1917), and adhered to ever since. In that case, the Court required the plaintiff to show that the property would be subjected to inevitably recurring inundation due to the action of the Government. The principle may be reduced to the simple expression: "One flooding does not constitute a taking * * *." B Amusement Co. v. United States, 148 Ct.Cl. at 341, 180 F.Supp. at 389. *See* Fromme v. United States, 188 Ct.Cl. 1112, 412 F.2d 1192 (1969). Indeed, several floods would not necessarily constitute a taking. *Cf.* National By-Products, Inc. v. United States, *supra*, and North Counties Hydro-Elec. Co. v. United States, *supra*.

▮ It is this principle which serves as an insurmountable obstacle to these plaintiffs. At no time do they allege that a flood of the type that injured their property in 1971 will ever inevitably occur again. Even if the court assumes *arguendo* that it was the authorized and proper conduct of the defendant's agents which caused the flood to be worse than it otherwise would have been, as the plaintiffs allege, this is not equivalent to contending that it is a continuing condition that will inevitably lead to future floods which would not otherwise occur. The plaintiffs' allegations are insufficient to make out a Fifth Amendment taking claim since they have neither alleged in their petition nor supported with affidavits the necessary prerequisites to such a claim as stated in United States v. Cress, *supra*. Without this essential element, the court has no choice but to find that the plaintiffs have at best presented a case of consequential injury due to governmental action, which would be an essentially tortious injury. Such a conclusion necessitates the granting of the defendant's motion for summary judgment. This, however, is not the only problem afflicting the plaintiffs' cause.

▮ The affidavit of Alfred L. Chase, accompanying the defendant's brief in this case, clearly indicates that if the dams had not been operational at the time of the 1971 spring floods, the water levels would have been much higher and, presumably, the damage much greater than actually occurred. The plaintiffs, of course, do not agree with this conclusion, but they do not provide the court with any support for their position in the way of affidavits, depositions or otherwise.[5] Summary judgment proceedings of the type now before the court are designed to pierce the pleadings in an attempt to dispose of sham or paper issues. F. James, Civil Procedure § 6.18 (1965). This can only be accomplished where the parties are required to supply depositions or affidavits to support their allegations or denials. This is the view taken by our Rule 101(f). A party is not free to simply rest on the general allegations or denials in its pleadings when contesting a motion for summary judgment. Since these plaintiffs have not provided the court with any evidence

---

5. The plaintiffs' brief included the affidavits of plaintiffs Conrad Hartwig and Donald Stricker and a consulting engineer, Ronald L. Vogel. None of these, however, provided any support for the allegation that the flood would have been less destructive if nature had been allowed to take its course, than with the dams in operation.

that the flood would have been less severe in the absence of the dams as they were in fact operated, the court is obliged to conclude, based on the Chase affidavit, that such would not have been the case.

■ The plaintiffs' response to the conclusions in the Chase affidavit is centered on the affidavit of their consulting engineer, in which the engineer contends that if the Bureau and the Corps of Engineers had released the excess runoff at a rate corresponding to the inflow into the various reservoirs, then there would have been no damaging floods, and there would still have been sufficient amounts of water to satisfy the irrigation demands. Putting those allegations together which have been supported by affidavit, the court is left with the argument that the operation of the dams helped the problem of the flooding, but they could have been operated in a way that would have helped more; therefore, the Government is liable for the damage that ultimately occurred.

The Supreme Court in United States v. Sponenbarger, 308 U.S. 256, 266, 60 S.Ct. 225, 229, 84 L.Ed. 230 (1939), answered a similar argument by saying:

> * * * The Government has not subjected respondent's land to any additional flooding, above what would occur if the Government had not acted; and the Fifth Amendment does not make the Government an insurer that the evil of floods be stamped out universally before the evil can be attacked at all.

This answer fits our case, particularly since the dams on the North Platte River were not even intended for use as flood control devices as was the project involved in *Sponenbarger*, but were simply reclamation projects which were also capable of providing some flood relief as an incidental benefit of their operation. The court can see no reason why the defendant should be required to pay for failing to take certain actions which hindsight tells us might have made the dam system even more beneficial in controlling floods, when it was under no obligation to save the downstream landowners harmless from the potential floods at the risk of having inadequate supplies of water for the beneficial irrigation and power purposes for which the system had originally been constructed, and for which purposes the defendant was legally obligated to operated the system.[6]

■ This leads to one further problem which should be discussed, although it is not essential to this decision. The Supreme Court in United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1943), held that the United States was not liable to property owners under the Fifth Amendment for the increased increment of value, resulting from the proximity of their property to a federal improvement where the property is later condemned, if the property was within the initial scope of the federal project. The "Miller Doctrine" was recently affirmed in United States v. Reynolds, 397 U.S. 14, 90 S.Ct. 803, 25 L.Ed.2d 12 (1970). In the case now before the court, it would appear that the plaintiffs have definitely benefited from the presence of the North Platte River dams, which allowed for more intensive cultivation of their land through irrigation. To this extent, their proximity to the federal irrigation project increased the value of their property. The facts presented by the parties on this motion for summary judgment, however, do not adequately develop the relevant benefit received by the plaintiffs versus the losses they suffered.[7] If it could be shown that the

---

6. The congressional reference case, Webb v. United States, 192 Ct.Cl. 925 (1970), is an example of a situation in which the Corps of Engineers failed to regulate a *flood control dam* to protect the downstream landowners. The Corps action in that case gave rise to a peculiarly equitable claim not founded on a tort or taking theory. Such equities are not present in this case.

7. The Chase report contained only general conclusions respecting benefits. It was estimated that the Glendo Reservoir was effective in preventing about $750,000 in flood damages in May 1971 and the other reservoirs prevented about $1,100,000 in damages from the June rise. The Corps of Engineers estimated May flood damage at less than $100,000 in Wyoming and Nebraska and

benefits exceeded the losses, then the plaintiffs would be precluded from recovery, where the other elements of the *Miller* decision are present, by this court's holding in John B. Hardwicke Co. v. United States, 199 Ct.Cl. 388, 467 F.2d 488 (1972). A trial of these issues is unnecessary in this case given the alternative bases already described for granting the motion for summary judgment.

For all of these reasons, the court feels, as a matter of law, that the defendant's motion for summary judgment should be granted and the petition should be dismissed. This ruling makes it unnecessary to consider the propriety of the plaintiffs' motions to have the court find that this case is a proper class action and to have the filing fee waived in excess of $10. The motions are denied as moot.

## CONCLUSION

The plaintiffs' motion to strike the affidavit of Alfred L. Chase is denied. The plaintiffs' motions to make this a class action proceeding and, in such event, to waive the filing fee in excess of $10 are likewise denied. The defendant's motion for summary judgment is granted. The petition is dismissed.

classified the flood as of the "Inconvenience Type." Nebraska officials were unable to certify this flood as creating a disaster area qualifying for state funds.