**J.B. and Pebble HERRIMAN, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

**No. 647–83L.**

United States Claims Court.

June 25, 1985.

Clifford K. Cate, Jr., Muskogee, Okl., for plaintiffs; Wilcoxen & Cate, Muskogee, Okl., of counsel.

Silvia Sepulveda-Hambor, Washington, D.C., for defendant; Robert Marshall, U.S. Corps of Engineers, Tulsa Dist., Tulsa, Okl., of counsel.

OPINION

NETTESHEIM, Judge.

This case comes for decision after trial. *See J.B. Herriman v. United States*, No. 647–83L (Cl.Ct. Jan. 29, 1985) (order denying defendant's motion for summary judgment on taking). The court considered post-trial briefing to be unnecessary, a view concurred in by plaintiffs' counsel. Plaintiffs complain that the Government,

through the Army Corps of Engineers (the "Corps"), took a permanent easement on their land by operating two dams and reservoirs in such a manner as to cause a river linking the dams to back up onto their property.

## FACTS

In addition to the facts stipulated by the parties and those recited on the record at the conclusion of trial, the following facts are found.

The subject property ("plaintiffs' property") consists of 253.2 acres (160 acres acquired in 1977, known as the Thompson tract, and the remaining 93.2 in 1980, known as the Roberts tract) located in Muskogee and Haskell Counties, near Muskogee, Oklahoma. To the west of plaintiffs' property, the North and South Canadian Rivers flow into Eufaula Lake through Eufaula Dam (jointly referred to as "Eufaula") and emerge as the Canadian River which flows downriver past plaintiffs' property and into the Robert S. Kerr Lock, Dam, and Lake ("Kerr"). Eufaula is located at Canadian River mile ("RM") 27.3; plaintiffs' property, at river mile 9.3, which signifies 9.3 miles from the confluence of the Canadian River and the Arkansas River at Kerr.

Plaintiffs J.B. and Pebble Herriman ("plaintiffs") are husband and wife. Throughout his life Mr. Herriman has been involved with farming in the vicinity. He has both operated a family farm and owned or leased additional farmland. Mrs. Herriman was raised on a farm and is an active farmer. Neither Mr. nor Mrs. Herriman had personal knowledge of the use to which the two tracts comprising plaintiffs' property had been put prior to 1977, the year they began negotiations to acquire the 160-acre Thompson tract; nor did they know anything about the impact of flood conditions on the subject property prior to the construction of the two dams involved in this case.

Both Eufaula and Kerr were authorized by the Rivers and Harbors Act of July 24, 1946, Pub.L. 525, 60 Stat. 634 (1946), and were subsequently designated by Congress in 1971 as part of the McClellan-Kerr Arkansas River Navigation System (the "project"). The project was adopted for the purpose of conferring multiple benefits on the Arkansas River Basin and along the Mississippi River. From Kerr the Arkansas River makes its way to join the Mississippi River.

The Corps commenced construction of Eufaula in 1956, and the dam was placed in operation in 1964. Although constructed primarily to control flooding, Eufaula also provides power and water supply, sediment control,[1] and recreation benefits. Eufaula

1. Plaintiffs rejected a proposed stipulation that one of the purposes of Eufaula was sediment

control. The finding in line with defendant's contention is based on the testimony of David

aids the McClellan-Kerr Navigation system by assisting in maintaining regulated flows of water. Flows are measured in cubic feet per second ("c.f.s."). Releases of water depend on such factors as power requirements, navigation water requirements, the amount of water in storage, river flows downstream, and weather conditions. Originally, the Corps planned to regulate flooding by discharging water from Eufaula Lake at a rate not to exceed 100,000 c.f.s., although up to 1968 releases did not exceed 13,000 c.f.s. An operating policy was adopted in 1968 of regulating releases at the lower rate of 40,000 c.f.s., ostensibly because land had emerged from the river downstream and was being used for agricultural purposes.

Construction of Kerr Dam began in 1964 and was completed in 1970. The authorized project purposes for Kerr were navigation, power, and recreation. Except for periodic drawdowns of two feet for power generation, Kerr Lake is operated with a more or less constant navigation pool elevation of 460 NGVD ("National Geodetic Vertical Datum," a method of measurement which replaced mean sea level) in the vicinity of the dam.

Plaintiffs' property is located in what has been over the millenia the flood plain of the Canadian River. Lay and expert witnesses for both parties described the Canadian River itself as dynamic. According to Jewell T. Wood, plaintiffs' expert structural engineer/hydrologist, rivers in general are one of the most dynamic subjects that engineers deal with. "[A] river changes moment by moment, day by day, and it has changed through the [millenia]." Transcript, May 24, 1985, at 1197 [hereinafter cited as "Tr."].

A plat from the Government Land Office Survey published in 1898 reveals that as early as 1896–1898 the land that became plaintiffs' property was visible. Beginning at least 1907–1916, the Thompson tract was farmed by adjoining landowner Lloyd W. LaFave's uncle and father. From 1916 to 1928, although this witness had left the property, his father leased it and Mr. La-Fave helped his father farm it. Raymond Snow, a life-long resident of the area who now farms land adjoining plaintiffs', saw all of the property being farmed during the 1930's. Aerial photographs taken from 1939–1962 show that as of 1939 part of the property was covered by the river and that by 1952, apparently as a result of the flood of record in 1943, all of the property was in the active stream channel, which is sandy and barren. Some of the property had emerged by 1962, and the balance was out of the active channel by 1964. From 1964 to 1984, plaintiffs' property was not covered with water continuously except during periods of floods. Mr. Snow saw what became plaintiffs' property cultivated in the late 1960's; Mr. Ward also observed cultivation in the early 1970's. In the late 1960's, land downstream had become capable of cultivation post-Eufaula, as appears from the testimony of David B. Kannady, Chief of the Lower Arkansas River Regulation Unit, Hydrology-Hydraulics Branch of the Corps, that farmers had complained about releases from Eufaula in 1968 which exceeded 50,000 c.f.s.—the first since 1964 to exceed 13,000 c.f.s.—inundating their property.

The amended complaint charges that defendant has raised and lowered the flow of the Canadian River across plaintiffs' property and thereby deprived plaintiffs of access

> during critical agricultural periods and that the Defendant has, from time to time, inundated the cropland of the Plain-

B. Kannady, Chief of the Lower Arkansas River Regulation Unit, Hydrology-Hydraulics Branch of the Corps, who is responsible for the water control management of Eufaula and Kerr and other reservoirs, and the striking evidence of sediment in the South Canadian River above Eufaula in contrast to downstream of Eufaula. This observation was made by the court without the parties or counsel present during an overflight site inspection of all of the locations referred to in this opinion. Plaintiffs' counsel properly objected to statements of defense counsel concerning the latter's observations during an overflight that she took before trial. However, as to the court's overflight, plaintiffs' counsel was given an opportunity to object prior thereto and registered no objection other than to decline to join the flight himself. In addition, the court conducted an on-site foot inspection of the subject property and adjacent area.

414

tiff[s] by virtue of its operation of said Project to the extent that Plaintiff[s] [have] been unable to conduct agricultural activities thereon as had been done prior to the regulation of the Canadian River by the Defendant.

Amended Compl. ¶ 4. Plaintiffs' theory of causation is both that the Corps regulated discharges from Eufaula to cause longer periods of flooding than pre-Eufaula and that as the Canadian River flowed into Kerr Lake a backwater effect was produced causing the river to back up onto plaintiffs' property.

In December 1976 plaintiffs inspected both the Thompson tract of 160 acres and the lesser 93.2-acre Roberts tract prior to acquiring the former. Plaintiffs could see that it had been farmed—specifically, it appeared that hay had been cut from certain pieces. Plaintiffs have planted soybeans and/or wheat on their land. According to both Mr. Herriman and defendant's expert botanist, wheat follows a crop cycle that begins in September with planting, continues with fertilizing, and ends with harvesting in the first half of June. Soybeans are planted in May for a single crop, and by June if wheat and soybeans are double-cropped. Soybeans are harvested in October, but can hold for up to 30–40 days—but no later than the first of the following year.

Mrs. Herriman testified convincingly about the inundation she observed on plaintiffs' property. In 1977 plaintiffs planted the Thompson tract in soybeans and made, or harvested, a crop of 20 bushels an acre, which was a low yield. During that year the river created no significant interference. In 1978 soybeans again were planted, and, again, the river did not interfere. In 1979 plaintiffs, having pulled out some trees, planted the entire Thompson tract in soybeans. Water backed up over approximately 17 acres of the crop for which plaintiffs unsuccessfully pursued a claim with the Corps. 1980 was the first year that plaintiffs farmed the Roberts tract, cultivating most of it along with all the Thompson tract. That year plaintiffs began double-cropping soybeans and wheat. When

harvested in 1981, the wheat yielded a good crop of 30 bushels an acre. Water came up on part of the property for approximately two weeks in June 1980, destroying part of the soybean crop. In 1981 plaintiffs recovered 15–20 bushels an acre from the soybean crop, a yield which Mrs. Herriman considered low and attributed to a drought.

In 1982 the river interfered with plaintiffs' farming on both the Thompson and Roberts tracts. On May 17, 1982, the property was inundated, submerged by May 18, and still under water on June 1, causing plaintiffs to lose most of their wheat crop. Although Mrs. Herriman did not record when the water went down, plaintiffs were able to go on the property to plant soybeans on July 15. Such a late planting of soybeans causes a low yield, because the plant needs to achieve growth before the summer heat intensifies. Mrs. Herriman could not recall the quantity of soybean crop that was made in 1982. The river came over their property on May 16, 1983, destroying another wheat crop, and remained until sometime in June. The soybeans were planted in late from July 18–20, and plaintiffs were unable to get a decent stand. By the fall of 1983, plaintiffs had given up on planting wheat due to the prior inundations.

In 1984 soybeans were planted early, but only yielded 10–15 bushels an acre due to drought. Again, plaintiffs did not plant wheat in the fall of 1984. Mrs. Herriman did not observe the river over the property until December of 1984. Beginning in December 1984, and by January 4–5 1985, plaintiffs' property was submerged until mid-May 1985.

It is possible to evaluate the discharges onto plaintiffs' property both pre- and post-Eufaula based on rainfall data and the records of flows made by the U.S. Geological Survey at the Whitefield Gaging Station, located on the river 9.5 miles upstream toward Eufaula from plaintiffs' property. These records have been kept since 1938. For purposes of this litigation, the period 1938–1964 has been designated pre-Eufaula and that from 1964–1985 as post-Eufaula. The readings are based on

continuous recordation by marking the water surface elevation and taking periodic measurements. There is no dispute that the streamflow data at Whitefield are representative of the flow of the river as it passes plaintiffs' property. Inflows into Eufaula Lake have been recorded on inflow hydrographs. The higher the flow rate, the greater will be the extent of overtopping adjacent land. When the discharges from Eufaula (or the flow rate pre-Eufaula) exceed 30,000 c.f.s., plaintiffs' property at 470 NGVD is over-topped. (A 30,000 c.f.s. flow rate produces a water surface elevation of 470.45 NGVD at plaintiffs' property).[2]

The sequence of events described by Mrs. Herriman is more or less consistent[3] with data from the Whitefield Gaging Station and the inflow hydrographs. The hydrographs furnished to the court cover a number of discrete periods and do not constitute a continuous record. In June 1979 plaintiffs' property was submerged for approximately four days at 30,000–36,000 c.f.s.; however, the inflows to Lake Eufaula during June 1979 were such that without Eufaula Dam plaintiffs' property would have been inundated for one day more at levels of from 35,000–82,000 c.f.s. Data for late May and early June 1982 show that plaintiffs' property was inundated for at least six days up to 44,000 c.f.s. Absent Eufaula the duration would have been nine days from 40,000–89,000 c.f.s. From June 6–16 of that year, plaintiffs' property was inundated by continuous flows of 41,000–44,000 c.f.s., although the inflows to Eufaula Lake would have been insufficient to overtop the property on all but three days. From June 16–23, plaintiffs' property was inundated by flows of 30,000–41,000 c.f.s. For the same period the inflows to Eufaula Lake on all but one day were well below 30,000 c.f.s. In 1983 plaintiffs' property was inundated beginning on May 16, and the discharge ran between 30,000–40,000 c.f.s. through May 21. However, from May 13–17, the inflow to Eufaula Lake exceeded 30,000 c.f.s. and reached a high of 126,000 c.f.s.

In December 1984 plaintiffs' property was not flooded. Beginning on December 30, however, the inflows to Eufaula Lake exceeded 30,000 c.f.s., rising to 95,600 c.f.s. by January 1, 1985. Plaintiffs' property was overtopped at 35,000 c.f.s. beginning on January 3 through January 6. The data for February 17–28 show discharges insufficient to inundate plaintiffs' property, although beginning on February 22 through February 28 pre-Eufaula flooding would have occurred to a level reaching 114,800 c.f.s. The data for March 20–31, 1985, reveal that plaintiffs' property was inundated for seven days at levels between 30,000 and 35,000 c.f.s. During the same period, the inflows ranged from a high of 159,700 to 16,000 c.f.s. and exceeded 30,000 c.f.s. for six days. In March 1985 from 21 to 22 days of discharges were made, the greatest being 35,000 c.f.s.; at the same time inflows ranged from 28,000 to 160,000

---

**2.** Defendant took the position that plaintiffs' property at least begins to be overtopped at 28,000 c.f.s. The more conservative figure of 30,000 c.f.s. for complete submersion has been adopted, even though Mr. Wood disagrees with it. However, he does agree that the elevation of the property is approximately 470 NGVD, and the data generated at the Whitefield Gaging Station are conclusive that at a flow rate of 30,000 c.f.s. the water surface elevation is 470.45 NGVD, which is sufficient to overtop plaintiffs' property. In fact, a survey that plaintiffs commissioned by Jones Barnett indicates that much of the property is between 460–470 NGVD, so that the amount of flooding both pre-and post-Eufaula has been greater and more frequent than the conservative estimate of flooding at 30,000 c.f.s. adopted in this opinion.

**3.** To the extent that a conflict exists, it is resolved against defendant only insofar as Mrs. Herriman's testimony concerning the length of time water stayed on plaintiffs' property, because the data discussed reflect the duration of flows, not the length of time that water remained on the land once the flow fell below a rate sufficient to overtop the land. A distinction needs to be made between periods of time when the land was submerged and periods when it was too wet to farm or even access. Although the concepts are somewhat confused in the record, it is found that plaintiffs' property has been submerged almost continuously from early January to May 1985.

c.f.s. for 15 days. The Whitefield Gaging Station and Eufaula Lake inflow data stop with March 31. Mr. Kannady testified from unofficial data that in April 1985 discharges for 14 days ranged from 28,000 to 40,000 c.f.s., including three days at the maximum rate, whereas inflows for five days ran over 28,000 to as high as 52,000 c.f.s.

The foregoing data demonstrate that during the time-frame of this lawsuit, Eufaula Dam markedly decreased overall the extent, and to a lesser degree, the duration of flows onto plaintiffs' property. Absent Eufaula, more of plaintiffs' property would have been flooded by discharges of 30,000 c.f.s. or higher for a somewhat longer period of time than without the dam.

Data of the same type also reveal that the level of flooding pre-Eufaula was substantially greater than post-Eufaula. Defendant's evidence, however, does not address the testimony of plaintiffs and their three percipient witnesses as to whether after Eufaula water would remain on the land for longer periods of time after flooding than pre-Eufaula. Messrs. LaFave and Snow testified that pre-Eufaula plaintiffs' property would be under water from two to four days, after which it could be farmed. Mr. Ward put the duration pre-Eufaula at a maximum of two days. He said that since 1979 plaintiffs' property had been under water up to 60–100 days, but only in 1985, and that water has stood several times for three or four days to a week or maybe a week and a half and sometimes longer. Mr. Snow testified that post-Eufaula the water has come up every year but one since 1977 for a week or two and that in 1983 the water stayed over plaintiffs' property for 30 days. The distillation of these witnesses' testimony is that water remained on plaintiffs' property both pre- and post-Eufaula for approximately the same period of time—up to four days—although, since 1983, and especially this year, water has stayed on for longer periods of time. In overview, the lay witnesses testified that pre-Eufaula floods would sometimes subside in time to save crops; post-Eufaula

the water runs off more slowly and consequently damages crops.

Defendant's data measured only the duration of flows sufficient to flood plaintiffs' property and not the period of time necessary for the water to run off and the land to reemerge. *See supra* note 3. Mr. Wood spoke to this point. He was of the opinion that because the top of the navigation pool at Kerr was kept at a more or less constant elevation of 460 NGVD, discharges coming into Kerr Lake from the Canadian River essentially had no place to go and would back up. According to Mr. Wood, because the elevation of the stream at the property is less than 460 NGVD, the stream at that stage is partly occupied by Kerr Reservoir. Thus, the river is backed up beyond plaintiffs' property even without any downstream flows from Eufaula, although "in the hydrological analysis, this is to a degree compensated for...." Tr., May 22, 1985, at 578. Mr. Wood explained the absence of severe flooding until recent years by hypothesizing that sedimentation had occurred in the river bed at some point downstream of the subject property where the velocity of the stream was slowed by its entry into a larger body of water. The flooding on plaintiffs' property was attributed by Mr. Wood to the combination of discharges from Eufaula, deposition of sand carried by the river, and backup from Kerr. This opinion derived from two on-site inspections and his review of a study of water surface profiles that the Corps calculated for the river using the Hydrologic Engineering Center ("HEC–2") Water Surface Profiles computer program.

The HEC–2 program is used for measuring the relationship between the flow of a river and resulting water surface elevations in river channels, given the necessary data on the riverbed, and is regarded by Mr. Wood as "one of the greatest things that has happened to hydrology since the beginning of time ...," Tr. May 24, 1985, at 1184, although its utility depends on human input. From cross-section surveys, changes in the bottom of the riverbed caused by sedimentation can be ascertained. The Corps profiles were developed

from cross-sections, or transects, of the riverbed between plaintiffs' property and Kerr—surveyed at river miles 2.0, 4.1, 6.4, and 9.3 (plaintiffs' property)—in 1963, 1977, and 1985. Mr. Wood did not testify how any differences in levels of sedimentation over these years verified his opinion, but did testify to the absence of any appreciable changes in the riverbed adjacent to plaintiffs' property.

Mr. Kannady and defendant's expert civil engineer specializing in hydrology, Dr. Richard DeVries, analyzed the HEC–2 studies and concluded that no backwater effect was evident. For 1963 the HEC–2 analysis showed a water surface elevation at river mile 9.3 of 471.3 at 30,000 c.f.s.; in 1977, the elevation was 471.1, given Kerr Lake pool elevations of both 460 and 465; in 1985, 470.45. The studies showed that, for a flow of 40,000 c.f.s., the water surface elevations at RM 6.2, given Kerr Reservoir elevations of 460, 462, and 465 NGVD, are 468.7, 468.7, and 468.8, respectively, which indicates that any backwater effect has dissipated by RM 6.2. According to Dr. DeVries, plaintiffs' property remains under water even after discharges from Eufaula have fallen below 30,000 c.f.s. because of the filling up of depressions on the land. In the area of what appears to be the backward movement of water observed by plaintiffs' witnesses on the east of the property (Jackson Creek), plaintiffs' property is lower than on the west.[4] Thus, according to Dr. DeVries, the water seeks the lower elevations, taking the path of least resistance, and fills up meander scars, the depressions in the land made by the past flow of water in the riverbed. Therefore, the water only appears to be coming from downstream. Dr. DeVries explained that the water might take a longer time to move out because it sits in the depressions and sediment blocks its exit. He suggested that plaintiffs may have leveled the property in the course of farming operations, thereby eliminating the previous drainage pattern.

**4.** According to the Jones Barnett survey that plaintiffs commissioned, *see supra* note 2, their property is at a lower elevation on the east near

## DISCUSSION

Taking claims must be decided on the particular facts of each case. *Berenholz v. United States*, 1 Cl.Ct. 620, 626 (1982), *aff'd mem.*, 723 F.2d 68 (Fed.Cir. 1983). When government projects on land owned or controlled by it subject a claimant's land to flooding, the Government may be deemed to have taken a flowage easement over the affected land. However, the taking need not be caused by direct flooding. Preventing the land from draining as it would have if left in its natural state can be the basis for imposing liability. *Baird v. United States*, 5 Cl.Ct. 324, 328 (1984).

In order to establish that the Government has taken a permanent easement by flooding, whether directly or by drainage prevention, the flooding must be intermittent, frequent, and inevitably recurring. *E.g., Cooper v. United States*, 8 Cl.Ct. 253 (1985); *Singleton v. United States*, 6 Cl.Ct. 156, 162 (1984); *Amick v. United States*, 5 Cl.Ct. 426, 429–30 (1984); *Jones v. United States*, 210 Ct.Cl. 467, 474–75, 538 F.2d 865, 870 (1976); *Hartwig v. United States*, 202 Ct.Cl. 801, 809–10, 485 F.2d 615, 619–20 (1973); *Fromme v. United States*, 188 Ct.Cl. 1112, 1118, 412 F.2d 1192, 1196 (1969). The United States Court of Claims held in *Barnes*, for example, that the taking by flooding occurred in 1973, when "the permanent character of intermittent flooding could be fairly perceived....," although sustained flooding of the land had occurred as early as 1969. 210 Ct.Cl. at 479–80, 538 F.2d at 873. One of the problems in this case is that the flooding has occurred sporadically since 1979.

Mr. Kannady, who is responsible for the management of the water as it moves through Eufaula and Kerr, testified that at the beginning of May 1982, exceptionally heavy inflow volumes had been recorded. May 1982 was the highest May inflow post-

Jackson Creek than on the west adjacent to the river. These survey results support Dr. DeVries' view to the same effect.

Eufaula, which was followed by the second highest June inflow. These were the two highest consecutive months on record since Eufaula was completed in 1964. In May 1983, the second highest inflow was recorded, and beginning in December 1984, "an unusual event" commenced leading to the second highest December inflow, the second highest January since 1939, the second highest February since 1939, the highest March post-Eufaula, and the second highest April. December 1984 to March 1985 were the four highest consecutive months since river flows began to be recorded in 1939. Except for these atypical highest or second highest months, the incidence of flooding that overtopped plaintiffs' property since they began farming it has not differed significantly from the incidence of flooding pre-Eufaula.

For example, plaintiffs' property would have been flooded for periods of more than ten days in late June 1941, late October and early November 1941; April and early May 1942; early March 1945, preceded by another five days earlier that month; in April 1945; for six days in early June 1945, followed by seven nonconsecutive days later that month; for seven days in September and early October 1945; four days in June 1946; seven days in December 1946; 15 days in May 1947; for more than ten days in June and early July 1948 and in May 1949; nine days in June 1949; seven days in June 1950; more than ten days in late July and early August 1950; seven days in September 1950; and so on. The foregoing excludes the flood of record in May 1943 which generated flows sufficient to overtop plaintiffs' property for over eleven days at rates up to 239,000 c.f.s.

These statistics may demonstrate that Eufaula has reduced the peaks, or extent, of flooding, if not the frequency, but they do not speak to the length of time water remains on property after a flooding incident. Although not fully consistent with that of the other lay witnesses, Mrs. Herriman's testimony is deemed the most credible on point due, in part, to her calendar notations; and it is found that the length of time water remains on the Herriman prop-

erty has increased since 1977, even excluding the unusual events of 1984–1985, as compared with pre-1977 or even pre-Eufaula. *See supra* note 3. Moreover, the intermittent flooding is a permanent characteristic of the river's impact on plaintiffs' property. The question becomes whether Eufaula and Kerr, which the parties have stipulated are part of the same project, confer a net benefit on plaintiffs' property.

Through overlays depicting the river channel as it appeared from 1939–1985, Dr. DeVries illustrated how post-Eufaula the river channel had stabilized from 1964–1985 in a manner that was not evident pre-Eufaula. The stability of the channel's location post-Eufaula had arrested the movement of this dynamic river and benefitted plaintiffs' property because the river did not move over the land as it had in the 23-year period between 1939–1962. Moreover, overwhelming evidence shows that the extent of flooding has been reduced on plaintiffs' property. Reduction of flows that previously exceeded 200,000 c.f.s. minimized the severity of flood damage which previously swept away land.

The doctrine of relative benefits was recognized by the former Court of Claims. *See ARK–MO Farms, Inc. v. United States*, 209 Ct.Cl. 116, 530 F.2d 1384 (1976); *Hartwig v. United States*, 202 Ct.Cl. 801, 485 F.2d 615. In *United States v. Sponenbarger*, 308 U.S. 256, 266, 60 S.Ct. 225, 229, 84 L.Ed. 230 (1939), the Supreme Court denied that a taking occurs when a flood control program aggravates the volume or velocity of inevitably destructive floods that would occur anyway absent the flood control project, where the program in its entirety greatly reduces flood hazards. The Court noted that the Government in that case "ha[d] not subjected respondent's land to any additional flooding above what would occur if the Government had not acted...." 308 U.S. at 266, 60 S.Ct. at 229. "[I]t has never [been] held that the Government takes an owner's land by a flood program that does little injury in comparison with far greater benefits conferred." *Id.* at 267, 60 S.Ct. at 229; *see*

*John B. Hardwicke Co. v. United States,* 199 Ct.Cl. 388, 467 F.2d 488 (1972) (recovery denied when older dam made land suitable for farming and reduced flooding, although later dam increased flooding, but not to the level of frequency which prevailed before both dams); *ARK–MO Farms, Inc. v. United States,* 209 Ct.Cl. 116, 530 F.2d 1384 (recovery denied when a project increased the duration of water elevations at lower levels but decreased the peaks, duration, and frequency of floods); *Bartz v. United States,* 633 F.2d 571 (Ct. Cl.1980), *cert. denied,* 450 U.S. 967, 101 S.Ct. 1484, 67 L.Ed.2d 616 (1981) (recovery denied based on relative benefits, even though operation of dam caused sustained high levels of stream which kept lower areas of adjacent farm too damp to farm).

Defendant's expert in river morphology (the relationship of the operation of a river to riverbed topography), Dr. Luther F. Holloway, was also qualified as an expert in the botanical characteristics of the ordinary high water line ("OHWL") and in river soils. This witness identified the OHWL as that point on the bank or edge of a stream at which the stream has dominated the vegetation. The river leaves an imprint on vegetation in the sense that, below the OHWL, only vegetation that can tolerate long periods of inundation is present. Dr. Holloway observed such vegetation as cottonwood and willow trees throughout plaintiffs' property. Despite Mr. Herriman's testimony that he had cut down a 40-year old cottonwood—which would indicate substantial vegetation existing over a period of time—the type of vegetation reflected in Dr. Holloway's study of the geomorphology of the Canadian River (including age-dating of cottonwoods on plaintiffs' property at no more than 17 years), as well as that observed by the court and reflected in the aerial photographs, is consistently younger, sparser, water-tolerant growth characteristic of areas below the OHWL, although Dr. Holloway's plant succession study reveals that plants tolerating drier conditions are moving down to the river due to the reduction in river flows onto plaintiffs' property. Dr. Holloway opined

that plaintiffs' property lies below the OHWL at 472.6 NGVD.

This expert also analyzed the soils on plaintiffs' property to gauge their suitability for farming and response to water. He concluded that approximately 70 percent of the soils were of the crevasse, or sandy type and 30 percent were kiomatia, which is predominantly sand. He characterized the soil overall as comprised of a high percentage of sand, droughty, very permeable to water, low in nutrients, and requiring a high level of management to stay in place and support crops. In such soil there is a close relationship between river stage and ground water levels, the two rising and falling together. As a result, when the river rises, the rising water table saturates and damages plant roots; when the river falls too low, the roots are deprived of water.

In addition, according to Dr. Holloway, Eufaula has lessened the river's interference with cultivation by reducing the sediment load, thereby reducing deposition of sediment on leaves and consequent interference with photosynthesis. Dr. Holloway agreed that if water remained over plants for any period of time, it would kill them. However, Dr. DeVries testified that an inflow to Eufaula Lake of 294,238 c.f.s. in November 1973 without the dam would have wiped out all plants in its path below Eufaula. Regarding the 239,000 c.f.s. 1943 flood, Mr. Wood testified that he would expect "dramatic changes" to result from such a flood. Tr., May 22, 1985, at 549. Dr. Holloway also presented testimony and exhibits illustrating the planting and harvesting of soybeans and wheat, both pre- and post-Eufaula. Pre-Eufaula flows of 30,000 c.f.s. would have resulted in lost soybean crops 73 percent of the time; post-Eufaula, 38 percent of the time. With respect to wheat, crops would have been lost 81 percent of the time pre-Eufaula; post-Eufaula, 44 percent of the time. The limitation to this analysis is that it does not take into account the time water remained on plaintiffs' property after the discharge decreased below 30,000 c.f.s.

■ Before the benefits conferred by Eufaula can be weighed against the detriment occasioned by the increasingly lengthy periods for which plaintiffs' property has been submerged, plaintiffs must prove by a preponderance of evidence that the construction and operation of Eufaula and Kerr were the direct and proximate cause of the prolonged submersion of their property. *E.g., Baskett v. United States,* 8 Cl.Ct. 201, 209 (1985); *Rhoads v. United States,* 6 Cl.Ct. 278, 279–80 (1984), *aff'd mem.,* 770 F.2d 182 (Fed.Cir. 1985); *Loesch v. United States,* 227 Ct.Cl. 34, 53, 645 F.2d 905, 919, *cert. denied,* 454 U.S. 1099, 102 S.Ct. 672, 70 L.Ed.2d 640 (1981).

■ In addition to the testimony of plaintiffs themselves, support for their theory of causation was provided by three lay witnesses—two adjoining property owners (Messrs. LaFave and Wood) and one farmer who worked adjoining land (Mr. Snow). A ruling was made at the pretrial conference that lay testimony would not be probative of causation except insofar as the lay witnesses had observed the phenomena which they were to address and that resolution of the complex factual issues would turn on expert testimony. *See Baskett, et al.,* at 225 n. 33; *Rhoads,* 6 Cl.Ct. at 280; *Loesch,* 227 Ct.Cl. at 45, 645 F.2d at 914. Despite inconsistencies attributable to the vagueness of the recollections of Messrs. LaFave, Wood, and Snow, their testimony, as well as plaintiffs', is sufficient to establish that the duration of inundation has increased post-Eufaula, at least during the period since plaintiffs bought the Thompson tract in 1977. All these witnesses observed that the inundation appeared as a backwater effect, *i.e.,* water moving up the Jackson creek adjacent to plaintiffs' property on the east and backing onto plaintiffs' property.

The court, in its discretion, has determined that such testimony regarding causation shall be accorded little weight. *See Greenwood Ranches, Inc. v. Skie Construction Co., Inc.,* 629 F.2d 518, 523 (8th Cir.1980). These witnesses testified as to what both parties agree is a hydrological issue, which can be evaluated and interpreted by experts. Furthermore, the inconsistency among plaintiffs' lay witnesses on the subject of the duration of inundation post-Eufaula and the vagueness of their testimony on pre-Eufaula damage to crops (in the case of Messrs. La Fave, Wood, and Snow) and on the incidence of flooding (in the case of Mr. Herriman) does not justify according their testimony the weight expert testimony commands. The problem is that plaintiffs' expert testimony is not decisive, and neither is defendant's, although the court is of the view that, on balance, the latter is more persuasive because it is based in part on the HEC–2 studies.

Mr. Wood, plaintiffs' expert, did not glean from the HEC–2 studies any corroborating evidence to support his backwater theory. He did not find fault with the analysis of cross-sections of the four points from plaintiffs' property downriver to the confluence of the Canadian and Arkansas Rivers. He testified that there had not been a change precisely at river mile 9.3, but he surmised that sedimentation had occurred elsewhere downstream, where the stream entered a larger body of water. Mr. Wood stated that, given the dynamic nature of rivers, he was reluctant to testify on causation with any degree of exactitude "[b]ecause we have not been able to run the backwater curves as required in the HEC–2 manual and conduct other studies of observation, having been in the field, to develop the correlation of flows, lake levels in Robert S. Kerr, and discharges from Eufaula." Tr., May 24, 1985, at 1196. The U.S. Army Corps of Engineers, Hydrologic Engineering Center, "HEC–2 Water Surfaces Profiles-Users Manual" (Sept.1982) (the "Manual"), prescribes:

> Cross sections are required at representative locations throughout a stream reach and at locations where changes occur in discharge, slope, shape, or roughness, at locations where levees begin or end and at bridges or control structures such as weirs. Where abrupt changes occur, several cross sections should be used to describe the change

regardless of the distance. Cross section spacing is also a function of stream size, slope, and the uniformity of cross section shape. In general, large uniform rivers of flat slope normally require the fewest number of cross sections per mile. The purpose of the study also affects spacing of cross sections. For instance, navigation studies on large relatively flat streams may require closely spaced (e.g., five hundred feet) cross sections to analyze the effect of local conditions on low flow depths, whereas cross sections for sedimentation studies to determine deposition in reservoirs may be spaced at intervals of up to five or ten miles. Manual at 14. Therefore, because the Corps took transects at roughly every two miles between plaintiffs' property and the confluence of the Canadian and Arkansas Rivers, Mr. Wood considers that the Corps analysis did not go far enough in studying the backwater effect. The quoted language does support his view insofar as additional cross sections were not taken at changes in the river channel downriver from plaintiffs' property.

Dr. DeVries, who conducted the same type of on-site inspections at roughly the same time as Mr. Wood, and Mr. Kannady had confidence that the HEC–2 analysis revealed an absence of any backwater effect.

On this record it would be impossible to conclude that plaintiffs had proved their theory of causation by a preponderance of the evidence. Although transects were not taken at as many intervals as the Manual suggests, defendant's studies are the only hard data that would indicate the extent of a backwater effect from Kerr. That these studies were not as thorough as they should have been does not mean that plaintiffs have proven the operation of a backwater effect. Because plaintiffs have failed to carry their burden on causation, the weight of evidence shows that the operation of Eufaula and Kerr conferred a net benefit in that there was no detrimental effect caused by the operation of Eufaula-Kerr.

Plaintiffs contend that their property was within the original Corps acquisition guidelines when it began to acquire properties incident to the construction of Kerr. A ruling was made that if this were so, any cause of action accrued to plaintiffs' predecessors and would otherwise be barred by the statute of limitations. However, plaintiffs were allowed to introduce evidence that the Corps, by its acquisition guidelines or otherwise, had admitted that plaintiffs' property should be acquired; or that the property met acquisition guidelines which were still valid and binding; or that the guidelines showed that the Corps predicted or recognized that plaintiffs' property would be flooded by Kerr, *i.e.*, that the impounding of Kerr would produce a backwater effect extending upriver to plaintiffs' property.

The portion of the guidelines moved into evidence suggested that sedimentation studies should be made as to Kerr's effect on tributaries, such as the Canadian River; but no such studies were made, other than the first HEC–2 study, which does not establish a backwater effect at the location of plaintiffs' property. The 1952 and 1962 aerial photographs of plaintiffs' property have been compared with the Corps segment map, illustrating the Corps acquisition guidelines of 470 feet and the property acquired. One such acquired parcel lies immediately north of plaintiffs' property and was part of a parcel including plaintiffs' property at that time. The land acquisition criteria have been described by the Corps thusly:

> The acquisition guideline for this project is elevation 463 feet mean sea level, or the areas affected by 150,000 cubic feet per second regulated discharge after 50 years of sedimentation, whichever is higher, with a minimum of 300 feet measured horizontally from the static full pool. The acquisition guideline elevation in the area near Mr. Herriman's property is elevation 470, mean sea level. . . .

Whether these acquisition guidelines have been binding at any time since plain-

tiffs acquired the Roberts tract in 1980 (plaintiffs did not obtain title to the Thompson tract until 1983) has not been the subject of any proof.[5] The record contains no evidence on the rate at which water has been discharged from Kerr. Although designed to accommodate a rate of 100,000 c.f.s., the releases from Eufaula have not exceeded 40,000 c.f.s. since 1968, assuming that these releases have anything to do with the Kerr acquisition criteria. Thus, a finding cannot be made that the Corps, through the acquisition criteria, recognized the operation would have a backwater effect on plaintiffs' property.

The segment map depicts acquisition of property north of plaintiffs', a portion of which was under water at that time, whereas a portion of the northeast quarter of plaintiffs' property which was in the active riverbed in 1964 was not acquired. Thus, it is apparent that the Corps acquired some property that was under water. That does not mean, however, that plaintiffs' property would have been acquired if the Corps had possessed a better map, because the Corps stopped acquiring land at a point that skirted plaintiffs' property at the tip of the northeast quarter.

The Corps operation of Eufaula and its regulation of discharges on the Canadian River has alleviated flooding conditions that would have occurred absent Eufaula, and Kerr has not aggravated drainage conditions.

## CONCLUSION

Based on the foregoing, judgment shall enter for defendant, and the Clerk of the Court is directed to dismiss plaintiffs' amended complaint.

IT IS SO ORDERED.

No costs.

5. In 1984 the Corps agreed that liability would be established if the Corps determined, based on a survey of plaintiffs' property and the "original land acquisition criteria," that the Corps should acquire plaintiffs' property. Status Report filed July 5, 1984, at 2. Evidently, the Corps views these criteria as viable. The legal effect, if any, of the criteria was not briefed by plaintiffs; however, defendant's authorities suggest that the Corps cannot be bound to apply them.