**Fred D. LEETH, et al., Plaintiffs,**

**v.**

**The UNITED STATES, Defendant.**

**No. 569–88L.**

United States Claims Court.

Jan. 31, 1991.

Jerold L. Drake, Grant City, Mo., for plaintiffs.

R. Anthony Rogers, Washington, D.C., with whom was Janie C. Cavitt, U.S. Army Corps of Engineers, Kansas City, Mo., for defendant.

## OPINION

ROBINSON, Judge:

This case is before the court after a trial of the liability issue and the filing of post-trial briefs by the parties. The amended complaint alleges a taking of plaintiffs' property under the Fifth Amendment of the U.S. Constitution as a result of flooding of plaintiffs' land allegedly caused by the backwater effect of the Harry S. Truman Dam and Reservoir at Warsaw, Missouri. Plaintiffs seek damages of $73,000 plus attorneys fees, interest and costs. For the reasons which follow the complaint will be ordered dismissed.

### Factual Background

The plaintiffs in this suit are Fred Dale Leeth (Leeth), Vincent F. Leeth and Marie Leeth Jones, by her conservator, Jennifer K. Leeth. Leeth's father acquired the subject property (the Leeth property), which is located in Vernon County, Missouri, in 1931. In 1964, Fred Leeth acquired sole title to the Leeth property from his father. By deed dated May 27, 1976 and duly recorded in Vernon County, Missouri, he transferred title to the Leeth property to himself, Vincent F. Leeth and Marie Leeth Jones as joint tenants with right of survivorship and not as tenants in common. Since Vincent F. Leeth was born on No-

vember 8, 1968, he was a minor at the time he received an undivided one-third interest in the property. Marie Leeth Jones, who now resides in Hollywood, California was declared mentally incompetent in a state court proceeding in California on April 6, 1989. At present, Leeth's daughter, Jennifer Kay Leeth, is the duly appointed conservator of Marie Leeth Jones.[1]

The Leeth property is located approximately 117 river miles upstream of the Truman Dam on the Little Osage River. It consists of approximately 200 acres of both woodlands and farmland, the latter consisting of small plots in various dimensions and locations within the property. The property is located less than one mile directly west of U.S. Highway 71 (Highway 71) but 2.7 river miles west of Highway 71. A map of the area showing the exact location of the property with reference to Highway 71, the Little Osage River and other reference points is a part of the record in this proceeding.

The legal description of the Leeth property is:

The East half of the Southwest Quarter (E ½ SW ¼ and all of the Southeast Quarter (SE ¼) lying North and West of the Little Osage River in Section 13, Township 37, Range 32, Vernon County, Missouri.

The Leeth property's southern boundary is the Little Osage River. Although there is a small trailer located at the southeast corner of the property, the land is otherwise unimproved land having no valuable buildings or other structures.

The Leeth property begins to flood from the Little Osage River when its waters exceed elevation 743 feet (ft.) mean sea level (m.s.l.), an elevation generally referred to as bankfull. However, most of the subject property is at elevations greater than bankfull as indicated by topographic maps. The Leeth property has always been the subject of considerable natural flooding throughout the period of record from 1940 to the present. It is located in the Osage River basin which drains an area of about 15,300 square miles located in west central Missouri and east central Kansas. The Osage River flows into the Missouri River about 14 miles downstream of Jefferson City, Missouri. The Kansas City Corps of Army Engineers (Corps) has responsibility for water control projects within a large geographic area which includes the Osage River basin. This basin has a number of significant multi-purpose lakes and dams, most constructed by the Corps, which act as effective flood control measures. The largest is Bagnell Dam which impounds Lake of the Ozarks. This dam is about 93 miles downstream of Truman Dam which is located on the Osage River at Warsaw, Missouri. The primary purpose of Bagnell Dam and Lake of the Ozarks, which are owned and operated by Union Electric Company, a publicly owned utility headquartered in St. Louis, Missouri, is the production of hydroelectric power. Because Bagnell Dam can store only a limited amount of water and is in close proximity to Truman Dam, the release of water by the Corps from the Truman Reservoir during flooding in the Osage River basin must be closely coordinated with Bagnell Dam's storage capacity.

The Osage River basin's major streams include the Osage River, Marais des Cygnes River, Hundred and Ten Mile Creek, Pottowatomie Creek, Big Bull Creek, Miami Creek, Little Osage River, Marmaton River, Clear Creek, Sac River, Pomme de Terre River, South Grand River and the Niangua River. To help control flooding in the Osage River basin, the Corps has constructed three flood control lake projects in Kansas. These are Melvern Lake, Pomona Lake and Hillsdale Lake. In Missouri it has constructed three. These are Stockton Lake, Pomme de Terre Lake, and Truman Reservoir. Except for Truman Dam and Stockton Lake, none of these lakes produce hydroelectric power. All of these lakes, however, help control flooding in the Osage River basin.

1. The original complaint in this case was filed by plaintiff Fred Leeth, on September 27, 1988. On April 11, 1990 an amended petition was filed joining Vincent Leeth and Marie Leeth Jones, by her conservator, Jennifer K. Leeth, as necessary plaintiffs pursuant to RUSCC 19.

The Truman Dam Project was authorized by the United States Congress in 1954 although it had been under consideration for many years prior to that time. It is a multi-purpose project which not only serves to produce hydroelectric power but also to protect fish and wildlife and aid in flood control in the Osage River basin. After completion of construction of the dam in late 1979, impoundment of water began. That portion of the Truman Reservoir reserved for flood control purposes, the flood pool, lies between elevations 706 and 739.6 ft. m.s.l. However, in order to have its full capacity for flood control, the level of the reservoir is maintained near elevation 706 ft. m.s.l. 70 to 80 percent of the time. Although the top of the dam is at 756 ft. m.s.l., at which height the integrity of the dam would be at risk if flood waters were impounded to that level, there is some surcharge storage between 739.6 and 751.1 and some "freeboard" for additional temporary emergency storage capacity between 751.1 and 756 ft. m.s.l.

Once the flood control pool level is exceeded the discharge of water from the reservoir is required in order to keep as much flood control capacity available as possible commensurate with conditions below the dam. Discharges of water are subject to relatively precise measurements and are generally described in terms of cubic meters per second (c.m.s.), cubic feet per second (c.f.s.), gallons per minute (g.p.m.) or acre feet (a.f.). Approximately 500,000 a.f. are used for power generation leaving approximately 4,000,000 a.f. available for flood control purposes. Thus, the Corps attempts to operate Truman Dam so that the dam is never required to impound more than 4,000,000 a.f. of water in the flood pool. Gauges are used for accurate measurement of water in the various streams which flow into the Truman Reservoir. These are strategically positioned and most are capable of measuring the discharge of water passing a particular point during a specified time measured in c.f.s. as well as the elevation of the water at that point. The Corps' expert analysis of the hydraulic and hydrologic data generated by these gauges gives it greater control over flooding throughout the entire Osage River basin thereby limiting the damage to property which might otherwise result.

There are several gauges which are relevant in this proceeding. One is located at Fulton, Kansas about 30 miles upstream from the Leeth property on the Little Osage River. Another is located near Schell City, Missouri on the Osage River, which is about that same distance downstream from the Leeth property. There is no Little Osage River gauge close to the Leeth property which is capable of measuring both the amount of water being discharged and the elevation of the flow. Recently, an additional gauge was installed at the Highway 71 crossing of the Little Osage River but that gauge is not capable of measuring water discharges, only elevations. Because of this deficiency, the Corps established a reference point on the Little Osage River, near its confluence with the Marmaton River, to permit a more accurate study of the alleged backwater effect at the Leeth property. It designated this point the "Horton Index Point" because it is located nearest to Horton, Missouri which is east of Highway 71 and its crossing of the Little Osage River. However, the Horton Index Point is actually 5 miles from that crossing. Other gauges are located on the Marais des Cygnes at the Kansas and Missouri state line and at Schell City, Missouri. Using data gathered by these gauges, and various scientific models and programs, the Corps has the expertise to determine with a reasonable degree of accuracy the backwater effect, if any, at discrete points on the Little Osage River, including the Leeth property.

A backwater effect is the effect of downstream water surface elevations on upstream elevations at a particular point upstream as well as the duration of that effect at that upstream point. Thus, the backwater effect upstream decreases as the distance increases from a particular lake pool elevation until there is no backwater effect. However, the backwater effect is always greater than the height of the downstream lake pool elevation. A back-

water effect can result from any physical circumstance which constricts the flow in the normal depth of a stream. For example, logs, fallen trees, brush or other debris, mud slides, other streams, natural lakes, bridges, levees and sharp turns in the stream channel can induce a backwater effect the magnitude of which will depend upon the particular circumstances involved in each case.

Records indicate that in the years following the Truman Reservoir reaching its multipurpose pool elevation in late 1979, the levels of water flowing into the Truman Reservoir from the Osage River, including the Little Osage River, were some of the greatest of record. Heavy rainfall runoff from 1981 through 1986 sent such great amounts of water into Truman Reservoir that the flows of the Osage River at Truman Dam were above to well above the average of such "inflows" at that point for the entire period of record beginning in 1940.

The Leeth property is particularly susceptible to flooding due to its proximity to the Little Osage River, its generally low elevations, and drainage conditions. In fact, the Leeth property has always been the subject of considerable natural flooding throughout the period of record from 1940 to the present. Moreover, soil maps prepared by the Conservation Service of the Department of Agriculture published in 1977, two years before Truman Reservoir reached its multipurpose pool level and became operational for such purposes, show that all the soil types on the Leeth property are wet types such as silty clays and silty clay loams which are not as conducive to growing crops as are other soils which dry more quickly and drain more easily.

The property immediately to the east of the Leeth property (the Wilson property) which is also bounded on the south by the Little Osage River has a five or six foot levee above the natural terrain which entirely surrounds the tract. The levee at the western edge of the Wilson property forms a straight line running north and south from the river bank to a point well north of the northernmost corner of the Leeth prop-

erty. Aerial photographs of the Leeth property and the Wilson property show that although the levee did not exist in 1965, by 1972 it had been completed. Later photographs taken in 1974, 1983 and 1990 show that the levee was intact at those times.

The presence of such an extensive levee immediately adjacent to the Leeth property, combined with the opposing bank height and sharp bend in the channel of the Little Osage River as it passes the Leeth property, result in a backwater effect which contribute to an increase in the elevation and duration of natural flooding on the Leeth property, apart from any possible backwater effect of Truman Dam.

Highway 71 immediately east of the Leeth property is raised ten to twenty feet above the normal terrain at its crossing of the Little Osage River. The effect of this embankment or impediment on the flow of the Little Osage River is relieved by the design and construction of one bridge opening beneath the highway as it crosses the main stem and two other bridge openings to the south as the highway crosses lesser channels of the Little Osage River. Three or four Missouri Pacific Railroad bridges are located immediately east of these highway bridges and also cross the Little Osage River with either three or four openings. They are approximately the same height as the Highway 71 bridges. Notwithstanding the height of the Highway 71 and railroad bridges, such bridges still restrict the flow in the Little Osage River and collectively cause an incremental backwater effect at the Leeth property separate from any such effect that may be attributable to Truman Dam. Thus, these bridges, none of which were constructed as a part of the Truman Project, also add to the elevation and duration of any natural flooding at the Leeth property.

Because of the magnitude of the flood which occurred in September and October 1986 in the Osage River basin, Leeth and other landowners in the Osage River basin complained to the Corps that the Truman Project was responsible for causing or aggravating the flooding on their respective

properties. In response to these complaints, the Corps undertook a study of this single flood to analyze and address only the effect of the Truman Project on flooding elevations. The study was published and furnished to landowners, including Leeth, in July 1987. The study was based upon a computerized hydrologic model of the Osage River basin. In one case, the model showed the Truman Project in place as it actually was during the 1986 flood, and, in a second case, the model assumed that the project had not been built, leaving the basin as it had been before any project construction ever occurred.

The study concluded that the Truman Project had, on the single occasion of the 1986 flood, caused increased flood elevations above the project easement boundary of 742 ft. m.s.l. at Roscoe, Missouri (immediately upstream of the Truman Reservoir) to a height of an additional 4.5 ft. From that maximum increase in elevation, the Truman Project effect diminished in the upstream direction so that at the Highway 71 bridge over the Little Osage River, the effect was "about 1 foot...." However, that study did not extend upstream in scope to the Leeth property.

One important additional finding of the study was that even without the Truman Project, the flood of 1986 in the upper Osage basin would have been very deep and that the Truman Project's incremental effect was very small on top of the very great flood depth that naturally occurred.

In contemplation of litigation, the Corps undertook a second study to analyze any effects of the Truman Project on increased duration of floodwaters, as opposed to just increased elevations, which had been the sole purpose of the 1987 published study. This second study in addition to elevations also gave consideration to the duration and frequency of any flooding attributable to the backwater effect from Truman Dam. Further, it took into account the entire period from 1940 through 1986 and encompassed in each year the maximum flood event in that year. This study was completed in 1989 and was furnished to the plaintiffs in this action in 1990. However,

because the 1989 study did not analyze the Little Osage River up to the Leeth property, for the purpose of this litigation, the Corps extended the 1989 study up to and including the Leeth property. Both of these later studies considered all years of record from 1940 through 1986. Since these two studies considered only the maximum flood event in each year during the 47 year period of the studies, it is not disputed that in theory, due to a backwater effect caused by the Truman Dam, there might have been lesser flood events in some years that could have affected the Leeth property that were not covered by these studies.

Since there was no long-term continuous stream gauge near the Leeth property in existence during the study period, the flows at the property had to be calculated using flow records from various gauges including those located at the Missouri–Kansas state line on the Marais des Cygnes River and near Schell City, Missouri on the Osage River. These computations permitted development of accurate estimated daily flows at the Leeth property by utilizing only the rainfall which fell over the Little Osage River basin as opposed to all Osage River basin rainfall. Thus, the computations were more accurately performed than would have otherwise been the case, because they excluded precipitation in the area between the Missouri–Kansas state line and Schell City.

These accurate estimated daily flows at the Leeth property were converted to corresponding elevations using a relationship between the flow in the Little Osage River at the Leeth property and elevations which that flow would produce. This relationship was determined using backwater computations. In its simplest terms, it may be said that the Corps' computations used geometric representations of the river channel and adjacent valley or cross sections to compute water surface elevations. The Corps' starting point for moving upstream, cross-section by cross-section, to the Leeth property was the Osage River above the Schell City gauge.

The hydrologic models used showed:

1. The natural condition in the Osage River basin (without the Truman Project or any other federal flood control projects being present or in operation) (the natural condition).

2. The condition of the basin with only the three federal flood control projects to the west of, but not upstream of, the Leeth property (the Kansas lakes) present and in operation (the modified condition).

3. The condition of the basin with all six federal flood control projects, including the three Kansas lakes, the Truman Reservoir and Stockton and Pomme de Terre Lakes in Missouri (the federal system of lakes) present and in operation (the "Truman condition").

The general conclusions reached from these comprehensive and accurate studies are that:

1. The Leeth property was, on the average, subject to significant natural flooding in more than five of every six years, for the 47–year period (1940–1986) of the study.

2. The three Kansas lakes, although not actually upstream of the Leeth property on the Little Osage River, reduce flood duration on the Leeth property by a small amount.

3. Truman Dam has increased flood durations on the Leeth property above its bankfull elevation a total of 3 days (one day each in 1982, 1985 and 1986) in the years since Truman Reservoir reached its multipurpose pool level for the first time in 1979.

4. Truman Dam would have increased flood durations on the Leeth property at its bankfull elevation an additional ten days between 1940 and 1978, had Truman Dam been in operation during that period.

Other pertinent conclusions reached from defendant's studies are that during the 47 years studied, the Leeth property sustained significant natural flooding in 41 of those years (above the 743 ft. m.s.l. bankfull elevation there), it was free of natural flooding in only six drought years of the study period, it experienced a total of 828 days of natural flooding (no effect from Truman Dam), and from 1979 through 1986 it experienced a total of 149 days of natural flooding. Further, had the federal system of lakes, including Truman Reservoir, been in place during the period of the studies, flood durations would have been increased on the Leeth property in seven years and decreased in two years. At elevation 743 ft. m.s.l., the effect of the federal system of lakes or the Truman condition, on the largest flood event in each year, would have been a total of ten days of flood duration in addition to the natural duration of 828 days. The Truman condition caused flood duration increases above elevation 743 ft. m.s.l. in three of the years (one day each in 1982, 1985 and 1986) which were incremental to natural flooding. Those three days of extra flooding lengthened natural flooding from 18 to 19 days in 1982, from 13 to 14 days in 1985 and from 27 to 28 days in 1986.

The first step in the process for calculating the probability of a backwater effect at a given site, is to complete a "frequency analysis." There are two methods for doing such an analysis. The first is known as the "partial duration" method which involves using all of the flooding events that occurred during the selected study period for which data is available and ranking them in their order of severity. The second is known as the "annual maximum" method which involves studying only the largest flood event in each year of the study period. This latter method is an acceptable method in the field of hydrology, although in the opinion of some expert hydrologists the former may be more accurate. The second step in the analytical process for both methods is to input the discharge data into a computer model and compute the corresponding stages for each of the discharges. The Corps' Hydrologic Engineering Center (HEC) at Davis, California developed the first model, the HEC–1. Later the Corps developed a second model (the HEC–2) to permit a more accurate development of the probability of occurrence of a particular level of flooding at a selected site. Thus, with the known elevation at which flooding in the past has occurred at a particular site, the probability of backwater

flooding can be accurately determined at that site.

### Plaintiff's Evidence

Plaintiffs' expert witness, Dr. Charles D. Morris, a professor of civil engineering at the University of Missouri at Rolla, Missouri and an experienced hydrologist, testified with respect to a backwater study he performed for purposes of this litigation which was based to a large extent upon defendant's studies. In his computations, he used the HEC–2 methodology with added cross-section data. His study also included the effect of Highway 71 and railroad bridges. He testified that in his opinion these bridges reduced the Truman Dam caused backwater effect at the Leeth property by about one-half during the 1986 flood which was the only event he studied. However, he testified that the Leeth property could be "and is" subject to more flooding and for longer periods than the defendant's study showed. He concluded that during the 1986 flood the backwater effect from Truman Reservoir at the Leeth property resulted in 1.15 ft. of increased elevation over what that elevation otherwise would have been. However, he did not quantify the added duration of flooding at the Leeth property attributable to the Truman Dam caused backwater effect. He further testified that "he assumed" that the backwater effect would be carried upstream to the Leeth property from the Marmaton River with lesser floods than the largest annual floods in the years defendant studied and with greater effect "because of the complex scenarios" of different backwater effects occurring between the confluence of the Marmaton River with the Little Osage River and the Leeth property itself. Dr. Morris admitted that Truman Reservoir would not alone ever cause flooding at the Leeth property and that such flooding would have to be incremental to natural flooding.

A neighbor of Leeth's, Tom S. Bridgewater, who lives adjacent to the Little Osage River on property which experiences flooding, testified that he has observed the Little Osage River for about 10 years. He said that he had noted an increase in "drift" (floating branches and debris) since the Truman Dam was completed in 1979 coming from upstream. He did not testify, however, that this "drift" or any other factor actually caused a backwater effect at the Leeth property nor did he attribute any particular flooding of the Leeth property to the Truman Dam.

A farmer and logger, Larry R. McCoy of Rich Hill, Missouri, testified that during past years he had cut various species of timber on the Leeth property including pecan, red oak, white oak and walnut. He testified that some of this timber was damaged and not good for anything except pallet material. This damage he attributed to "tree rot" caused by water getting into the heart of the trunks of trees. He said this occurs through openings in the bark of trees called "cat faces." However, he admitted he had no expert knowledge of tree diseases and had done no actual study of diseases or water damage to plaintiffs' trees.

Honorable H.A. Kelso, a retired Missouri circuit judge, testified that he is the owner of a 2400 acre property on the Little Osage River, the western border of which begins about two and one-half miles due east of the Leeth property near the confluence of the Little Osage River with the Marmaton River. He stated that although the Leeth property has always flooded, in his opinion based upon his observation, Truman Dam had made the water come up "more frequently and stay up a little longer," but he admitted that he had no scientific basis for this opinion. He stated, further, that the Corps had purchased a significant flowage easement on his property up to the 742 ft. m.s.l. because his property has low points which flood. In fact, he said that the lowest point on his property is at 726 ft. m.s.l. However, Judge Kelso admitted that he did not know whether any part of the high water problems his property had experienced at any time in the past were due solely to a backwater effect from Truman Dam.

A former tax assessor for Vernon County, Missouri, Richard Peckman, testified that the Leeth property comprises less than

193.8 acres. After an inspection he conducted with an appraiser of the property on January 21, 1987, he reduced its value for tax purposes from $52,900 to $26,800. This reappraisal resulted from the Missouri Tax Commission's recommendation, addressed to all Missouri county tax assessors, to lower the values of lands which frequently flood.[2] This reappraisal of the Leeth property had nothing to do with the alleged backwater effect from Truman Dam on the Leeth property or any other property. Peckman's reassessment encompassed all farm properties which flood and, thereby, become less valuable due to the limited types of crops which such lands will support, regardless of where they are located.[3]

Peckman admitted that he knew nothing about the frequency, duration or elevation of flooding on the Leeth property. He placed the market value of the Leeth property after his reclassification and reassessment at approximately $138 per acre.

A part time farmer from Nevada, Missouri, Max Handly, who had farmed various fields on the Leeth property in the past, testified that due to flooding some of the crops he had planted, including milo and wheat, had been lost and that without federal crop insurance it would be too risky to continue renting these fields for his farming purposes. He stated that the water which flooded his crops in June and July 1990, came from up river and local rains. He did not testify that the crop damage he had experienced on the Leeth property was in any measure due to the backwater effect from Truman Dam.

Fred Leeth, who resides in Grant City, Missouri, testified that the Leeth property is drained, in part, by the Davis Slough which cuts through the middle of the property at about elevation 740 ft. m.s.l. and empties into the Little Osage River. He stated that the property's drainage patterns are complex and that flood waters back up into the Davis Slough. He stated that although there is a levee on the Wilson property to the east of the Leeth property which was built some time after 1960, he had "not noticed" that that levee had affected the drainage of the Leeth property. He admitted that the Lyon property, which is located to the north of the Leeth property, had been cleared several years ago. However, he contended that although runoff from the Lyon property drains onto the Leeth property, this water goes into the Davis Slough. He stated that when the water rises in the Little Osage River to 743 ft. m.s.l. flood stage, 100 acres are flooded. He further testified that after Truman Reservoir was filled "it became apparent that there was additional depth to the floods." He said that in eight of nine years the water elevations exceeded approximately 746 ft. m.s.l. and "stayed up longer." Additionally, he noted that the floods left mud, silt and "drift" on the Leeth property which had to be removed and that in his opinion these conditions were now worse than those which existed in the 1960's and 1970's. Leeth further testified that in his judgment Exhibits J1 and J2, which were prepared by defendant, show that damage to the Leeth property was caused by the Truman Dam, but that he did not believe the damage could be attributed to only one foot of additional flooding over natural flooding.

On cross-examination, he admitted that plaintiffs had done very little to facilitate better drainage of the Leeth property, although placement of temporary drains had occurred and some rock had been put down in the roads. Leeth testified that about 1979 he went for the first time to Truman Dam to determine from Corps officials how far the water in the Truman Reservoir would back up the Little Osage River. At

---

**2.** The Commission and the University of Missouri are responsible for setting land values on soil in the state based upon eight grades or classifications with a dollar amount put upon each grade.

**3.** Notes taken by Peckman at the time of inspection state: "May have some seasonal flooding. 1/21/87. After inspection, put all Grade II and Grade III into V and all V into VI." These reclassifications were based upon general criteria established by the Tax Commission and the University of Missouri applied subjectively through personal observation without any soil analysis or use of topographic maps or land use history.

that time he was shown a shaded area which was at a maximum elevation of 742 ft. m.s.l. He stated that in his opinion this showed that the Leeth property was affected at its northeast corner and that this effect extended toward its southwest corner. He stated further that he was concerned at that point about any backwater effect and actually asked, "How far is that water going to back up?," but he did not testify as to any answer he may have received.

Leeth testified that his next contact with the Corps was when he stopped by the Corps' Clinton, Missouri office a "couple of years later" when he had "ifs" about the effect of Truman Dam on the property. However, he stated that not withstanding his doubts he "knew that it was definitely having some effect." Leeth made a third trip, first to the Corps' Clinton office which at that time was closed, and then to the site of Truman Dam in Warsaw, Missouri, to discuss the effect of Truman Dam upon the property. His recollection is that this third trip was made in 1985 or 1986. He testified that he was then referred to the Corps' Kansas City, Missouri office. In December 1986 after the severe flooding in September and October and a trip to his property to view the flood damage, he stated that he visited the Corps' Kansas City office and discussed with Col. Amrine the effect of Truman Dam on the property. He further testified that Col. Amrine told him that Truman Dam had had no effect on the property but he would be placed on the Corps' mailing list.

In substance, Leeth also testified that during periods of high water the banks of the Little Osage River at the Leeth property would get soaked and periodically would slide off into the Little Osage River which on occasion has caused the loss of trees and fencing.

After the 1986 flood Leeth testified he received a letter from Larry R. McCoy (the logger who had testified on his behalf earlier during the trial) regarding possible flood damage to his trees. He contacted McCoy as a result of this letter. That contact resulted in a joint inspection of the Leeth property trees to determine the effect of the flooding upon them. After that trip, he said he allowed some cutting of those trees which had "cat faces" or were showing other signs of damage such as discoloration and rot. He testified that the logs from these trees were sold for veneer or pallet uses depending upon the extent of the damage. The money he said he received for the trees was given to others and not treated as income or reported on his tax return for that taxable year because, in his opinion, "he did not personally gain" from the timber sale.

In answer to Interrogatory No 7, plaintiffs stated that during Leeth's first visit to the Corps' office he was told about the purchase of easements up to the 742 ft. m.s.l. elevation, that he was shown a wall map depicting the flood pool and area affected by the Truman Reservoir and that that map showed that his land was affected. With respect to the second conversation he had with the Corps, he stated that:

> Two to three years after the first conversation, I went to the Corps of Engineers' office at Clinton, Missouri. The office is on the west side of the highway.... The increased flooding which is the subject of this litigation had begun to occur.

Leeth admitted on cross-examination that the particular year two or three years later referred to in his answer to Interrogatory No. 7 mathematically could have been no later than 1982, but he professed not to know what time in that year his second visit occurred. Additionally, he testified that his earlier statement was in error and that his second visit to the Corp was not until 1983 or 1984. Also, during cross examination, he admitted that the property to the north of the Leeth property had been cleared in recent years but he stated he had "never been up there," had never had any discussion with the owners about drainage of their property on to the Leeth property and could tell no difference in drainage from that which existed prior to the clearing.

Leeth claimed losses from flooding due to Truman Dam but admitted that he had not claimed such losses on his income tax

returns for any taxable year. Nor did Marie Leeth Jones' 1987, 1988 and 1989, and Vincent Leeth's 1987 and 1988 tax returns, which were part of the record, show that they claimed such losses. Although Leeth's return for the year 1987 showed a small amount of income from "pecans," he stated that that entry was in error and that that income should have been attributed to pecan logs and not to pecans. Further, he said he did not understand that he could have claimed a loss for 1987.[4]

### Defendant's Motion to Dismiss for Lack of Jurisdiction Based upon the Statute of Limitations

At the conclusion of plaintiffs' case in chief, defendant's counsel first orally moved for a dismissal of the complaint on the ground that the court is without jurisdiction because the plaintiffs' suit is barred by the applicable six year statute of limitations. Defendant's motion was premised upon Fred Leeth's admission that he certainly *knew* in 1982, two or three years after his first visit to the Corps' office in Warsaw, Missouri in 1979, that Truman Dam was having an effect on his property. Thus, defendant contended plaintiffs were put on clear notice of the occurrence of all events upon which any claim against the government could have been premised if not in October 1979 (the first taking date), when the Truman Reservoir began operating as a detention basin, certainly by 1982 (the second taking date), after sufficient flood events had occurred, with attendant substantial damage, to reasonably provide the necessary notice to plaintiffs of any alleged incremental flooding due to Truman Dam. Thus, assuming that the alleged flooding frequency and extent of damage to the Leeth property were sufficient to constitute a prima facie taking case, defendant argued that since the suit was filed on September 27, 1988, or well beyond the first taking date and beyond the second taking date, the statutory six year bar required dismissal of the complaint as to all three plaintiffs.

In response, plaintiffs orally argued at trial that, contrary to plaintiffs' answers to defendant's interrogatories, Fred Leeth during his trial testimony had in essence corrected plaintiffs' answers to these interrogatories by stating that it was only upon his second trip to the Corps' offices in 1983 or 1984, a visit triggered by the 55 days of flooding the Leeth property experienced in 1983, that he could have known of the incremental flooding attributable to the Truman Dam. Further, plaintiffs argued that Leeth had been "put off" by the Corps' answers to his questions and that this would toll the statute of limitations. Finally, plaintiffs argued that since Vincent Leeth was a minor until November 7 or 8, 1986 when he reached the age of 19, the statute of limitations could not have run as to him. Thus, plaintiffs contended that the court should not dismiss plaintiffs' complaint.

The court took under advisement the issue of application of the six year statute of limitations. Both plaintiffs and defendant addressed this issue in their respective post-trial briefs. On brief, defendant argues that:

1. Plaintiffs' interrogatory answers made it abundantly clear that Fred Leeth knew, at least in 1982 if not in 1979, all that he needed to know respecting the plaintiffs' claims in order to have adequate notice of any possible backwater effect on the Leeth property from operation of Truman Dam.[5]

2. Leeth had always well understood plaintiffs' present theory of causation and, in fact, had always thought that Truman Dam since its completion had caused incremental flooding of the Leeth property.

3. Plaintiff Marie Leeth Jones was not shown by plaintiffs' evidence to have been

---

4. Also, he stated because of his land rental arrangement, he did not share in the losses from farming operations performed by others and that he had claimed no losses from his own farming operations in 1989.

5. Impliedly, defendant also argues that Fred Leeth's knowledge reasonably must be imputed to the other owners who clearly have always relied upon his personal control over and management of the Leeth property on his own and their behalf.

478

incompetent prior to the time of filing of this suit and that the only date established by plaintiffs for her alleged incompetency was the date for her conservator's appointment which was on April 6, 1989.

4. If Marie Leeth Jones' incompetency in fact occurred after accrual of her claim (as appears to have been the case), the statute of limitations would not have been tolled by such incompetency and, therefore, as to her claim the statute of limitations acts as a bar.

5. If it is assumed that plaintiff Vincent Leeth reached his majority on November 7 (or 8), 1986, as testified to by plaintiff, Vincent Leeth would have had only three years in which to file suit from that date, but since he was not joined as a plaintiff in this suit until April 1990, over three years later, the three-year statutory bar necessarily applied to him.

6. Regarding the legal effect of Fred Leeth's discussions with defendant's personnel, mere negotiations over whether a claim existed as well as the possible magnitude of a claim do not serve to toll the statute of limitations. Consequently defendant's statements to Fred Leeth during these discussions that it was looking into the matter would not excuse "litigative timidity."

Thus, defendant's brief reaffirmed its contention that the applicable six-year and three-year periods of limitation had served to bar all three of the individual claims of plaintiffs, and again requested dismissal of plaintiffs' complaint.

In its post-trial brief plaintiffs again argued that since plaintiff Vincent Leeth was born on November 8, 1968, he had three years (from an unspecified date) after reaching his majority under Missouri law to file suit and that since suit was filed September 27, 1988, he was within the three year statutory period.

Further, plaintiffs argued on brief that since Mary Leeth Jones' conservator was appointed April 6, 1989 there was no evidence that the statute of limitations had ever started to run against her. Finally, plaintiffs argued that, since Fred Leeth had corrected his uncertain prior recollec-

tion as to when his second trip had occurred (1983 or 1984 rather than 1982), the statute of limitations had not run as to his claim notwithstanding his prior answers to defendant's interrogatories. Therefore, plaintiffs' brief sought denial of defendant's motion for lack of jurisdiction.

## Defendant's Motion for a Directed Verdict

Defendant also orally argued after plaintiffs had completed their case in chief that the court should direct a verdict for defendant because plaintiffs' evidence was insufficient to meet their burden of proof of showing that the Leeth property had experienced flooding that was permanent, frequent, intermittent and productive of substantial damage. In summary, defendant stated that plaintiffs' evidence was legally insufficient because it only showed the following:

1. The Leeth property had historically been the subject of extensive natural flooding.

2. Any backwater effect from Truman Dam would have been incremental to that natural flooding.

3. In the year 1986, the only year studied by Dr. Morris, plaintiffs' expert witness in hydrology and hydraulics, the incremental flooding was only about one foot.

4. Based upon defendant's flood studies (already in evidence by stipulation or agreement of the parties) which were also considered by Dr. Morris, with respect to major flood events in each year of the 47 year period covered, in only 4 years (1943, 1951, 1985 and 1986) would there have been any incremental effect from Truman Dam had it been in place during the entire period.

5. The incremental or backwater effect as shown by defendant's studies (already in evidence) ranged from a low of .1 ft. to a high of 1 ft., and that natural flooding during the major flood events in all four of those years involved floods which crested at the Leeth property from 6 ft. to 14.4 ft. over the bankfull elevation of 642.8 ft. m.s.l. at that point.

6. None of plaintiffs' lay witnesses' testimony was sufficient to prove that Truman Dam had actually caused the greater frequency and higher flood elevations they had described.

7. The tree damage some of plaintiffs' witnesses testified about, which was allegedly due to higher water levels during flooding (attributable to "cat faces," discoloration and rot), was not presented through expert testimony, was not credible and, therefore, not entitled to any weight.

Defendant, in its post-trial brief, reiterated these oral arguments and added others. In summary, defendant's brief alleges that:

1. At best, plaintiffs presented a case of trespass, an injury in the nature of a tort which did not meet the test for the taking of a flowage easement by inverse condemnation.

2. Although Dr. Morris had criticized the annual maximum method of computing the frequency of flooding which was used by defendant in its studies, he had confirmed that both his method and the defendant's method are perfectly acceptable in practice.

3. Plaintiffs' lay witnesses had failed to offer any evidence to support the basic elements of a valid taking of a flowage easement.

4. Plaintiffs' evidence respecting rot, worm, and other tree damage was deficient in that it was not supported by an expert's study.

5. Plaintiffs' lay witnesses' testimony had confirmed that the 1980's had been a very wet decade, but that they had made no comparisons to adequately prove this.

6. The damage to crops growing on the Leeth property based upon plaintiffs' evidence could not be attributed solely to incremental flooding due to Truman Dam.

7. Plaintiffs had done nothing to maintain the drainage system on the Leeth property or to confirm whether the levee system constructed on the Wilson property to the east of the Leeth property had contributed to flooding on the Leeth property.

8. Testimony that plaintiffs had suffered losses was not credible because on Fred Leeth's income tax returns, he had never claimed any losses due to flood damage on the Leeth property during the 1980's.[6]

As previously noted at the conclusion of the parties' oral arguments as presented at trial, the court took under advisement defendant's oral motion with respect to both the statute of limitations issue and the issue of plaintiffs' failure to present a prima facie case. Consequently, the court required the defendant to go forward with presentation of its case.[7]

### The Defendant's Evidence

Defendant's first witness, Francis E. Georgie, is an expert cartographer with the Corps. Georgie, after describing his duties in map making, the type of stereoscopic equipment the Corps uses, and various map making and interpretation techniques, testified that based upon the Corps' 1939 photos, marshy areas existed on the Lyon property which extended southward onto the Leeth property; the main levee on the Wilson property had not been built at that time; Highway 71 was only two lanes with only three bridges over the Little Osage River; there were four railroad bridges located east of Highway 71; there were no dead trees on the Leeth property; the Leeth property had open fields much as it does today; the Davis Slough, the principal

---

6. Plaintiffs' post-trial brief did not specifically address the issue of whether its case-in-chief was sufficient to withstand defendant's motion for a directed verdict for failure to constitute a prima facie basis for recovery. Plaintiffs' brief took into account all of the evidence submitted and basically argued that the plaintiffs should prevail on all issues because all evidence including the defendant's evidence supported the conclusion that a taking of plaintiffs' property had occurred.

7. The court in this Opinion necessarily must first rule on both of these two issues presented by defendant's two motions that were taken under advisement, based not only upon those oral arguments submitted at trial, but also the parties' post-trial briefs as summarized above.

drainage ditch on the property, also existed then much as it does today.

With respect to the Corps' 1965 photos, Georgie testified that no levee was yet shown on the Wilson property, no dead trees existed, and very similar characteristics existed as to those shown in the Corps' 1939 photos. He said, further, that the lowest elevation shown on the Leeth property is 744.5 ft. m.s.l. according to both the 1939 and 1965 photos; that according to his measurements the flood plain at the Leeth property, without any blockage of flow in the Little Osage River by the Wilson levee, was approximately 3600 ft.; and, that a flood height of 750 ft. m.s.l. would have inundated the entire area of the Leeth property.

According to the Corps' 1972 photos, Georgie testified that the Wilson levee was in place; no dead trees existed; there were pool areas on the Lyon property; Highway 71 had been expanded to four lanes with a total of six bridges; there were four railroad bridges to the east of Highway 71; and, that with the Wilson property levee in place, the width of available flood plain at the Leeth property had been reduced from 3600 ft. to only 650 ft.

According to the Corps' 1974 photos, Georgie said he had concluded that little significant change affecting the Leeth property had occurred since the Corps' 1972 photos were taken, but the Corps' 1983 photos showed that the Lyon property had been completely cleared of timber, a ditch had been dug which drained toward the Leeth property and there appeared to be an increase in water runoff onto the Leeth property. He stated that the Corps' 1990 photos showed that all ponds had been removed from the Lyon property, the drainage ditch on the Lyon property was in place and all other conditions he had previously noted were substantially the same as shown in the earlier photos, except that the 1990 photos showed one dead tree. However, he said that during his site visit he saw no dead trees at all.

Lloyd Wisdom, Chief of the Hydrology and Hydraulics Section of the Corps, testified that he supervised the defendant's backwater computations for purposes of this case. He stated that at the Leeth property, the "near bankfull" water level in the Little Osage River was 743 ft. m.s.l. and although there are some elevations on the Leeth property that are below 742 ft. m.s.l., these are located in drainage ditches or sloughs; the number of storms and the amount of annual precipitation in the Osage basin has not changed dramatically over the years, the 100 year precipitation patterns are much the same; the Highway 71 bridges are 15 to 20 ft. high; and, the Wilson levee which is in the form of an earthen embankment part of which extends north and south on the west side of the Wilson property generally parallel to the county road from the county bridge up to and past the north edge of the Leeth property, is 5 to 6 ft. high and that levee is unbroken.

Wisdom stated that the Highway 71 and railroad bridges narrow the flow of the Little Osage River at that point thereby creating a separate backwater effect after such flow exceeds bankfull and that the effect continues to increase in both elevation and duration as the flow increases. He testified that the Wilson levee does the same thing until the flow exceeds at least two ft. over the levee at the west side of the Leeth property. Further, he said that the high river bank on the south side of the county bridge also causes a convergence of water leaving only a small area to the north of the levee for flood waters to escape around the levee.

Wisdom said the Corps' study involved measurements in one foot increments which was proper because of the huge amounts of data which the study would have otherwise been required to incorporate had any smaller measurement been used. He testified that had the Corps attempted to study all of the floods during the 47 years covered by the study, rather than the maximum flood event in each year, the study might have shown that twice as much water in volume would have been shown but not many additional days of flooding. Thus, he contended that the

Corps' studies represented a fair analysis for the periods covered.

Finally, Wisdom stated that a lay person living along the Little Osage River both before and after Truman Dam was constructed, merely through his observation of flood events would not be able to attribute a given backwater effect, one measured in discrete increments, to any one causative factor due to the number of variables involved in this type of complex equation. He further stated that a lay person could be easily confused as to causation (and could therefore reach the wrong conclusion as to causation) because a backwater effect looks the same regardless of its cause.

Jerry Buehre, Chief of the Corps' Water Control Section which has responsibility for monitoring water gauges in the Osage basin, testified that the operation of the gauges gives the Corps control over the release of water from Truman Dam thereby lessening the harmful effects of downstream flooding. He said the 1986 flood caused the flood pool in Truman Reservoir to reach a top of 738.5 ft. m.s.l. and that during the months of September and October 1986 over 6,000,000 a.f. of water fell within a total of 30 days. He said that based upon Fulton, Kansas gauge data, the flow was twice as much as had ever been recorded before at that point in the Little Osage River, and that the height was 14 ft. over flood stage. He stated that a flood of that magnitude would likely occur only once in 500 years. He said the Fulton gauge data also showed that before and after construction of Truman Dam significant natural flooding would have occurred at the Leeth property. Further, he stated that the operation of Truman Dam could not have caused flooding at the Leeth property at the times claimed by plaintiffs' witnesses since the flood pool levels at those times were simply too low for the dam to have been in any degree a contributing factor. During those times identified by plaintiffs' witnesses, he said the highest flood pool elevations ranged from 707.22 to 722.97 ft. m.s.l.

George Cornwell, a hydraulic engineering specialist and an expert hydrologist,

testified that the J–1 Report which was completed in 1987, only concerned elevations of flood waters attributable to the 1986 flood with and without Truman Dam in place but that that study did not go above the Highway 71 crossing of the Little Osage River. He stated that, nevertheless, the J–1 Report study found that the increase in elevation due to the backwater effect at that crossing was only one foot and the increased elevation at the Leeth property would have been less than 6″ because it is 2 and ½ river miles upstream from the crossing. He testified that the J–2 Report study which was completed in April 1989 and covered both elevations and durations of maximum flood events in the period from 1940 through 1986, concluded that Truman Reservoir had had no effect on the frequency of flooding over natural flooding and that during only 94 days out of a total of 47 years had there been above bankfull flooding at the Horton Index Point (at elevation 737 ft. m.s.l.). He stated that by use of a simulated gauge for the Little Osage River, using the Schell City and the Marais des Cygnes gauges, the latter located at the Kansas–Missouri state line, and the Corps' program for computing the backwater effect at a given point (not HEC–2), the Corps' study showed that during the 47–year period of the study there were 828 days of natural flooding of the Leeth property and that had they studied all flood events there would have been over 1600 days of such flooding. He testified that there were 156 days of natural flooding from November 1979 through December 1986 and that Truman Dam had had an effect on the Leeth property only during three days, or one day in each of the years 1982, 1985 and 1986. Thus, he testified that in 1982 Truman Dam did not raise the flood elevation at the Leeth property by any amount, but increased the duration of flooding above that which naturally occurred by one day. He stated that in 1985, Truman Dam raised the flood elevation at the Leeth property by .1 ft. and increased the duration of flooding by one day. In 1986, he stated that Truman Dam raised the flood elevation at the Leeth property by .8 ft. and increased the duration of

flooding by one day. In 1986, he stated the flood waters obtained a height of 14.5 ft. over the bankfull elevation of 743 ft. m.s.l. at the Leeth property. In 1988 and in 1990 when plaintiffs' witnesses testified respecting flooding problems, at no time did the elevations in Truman Reservoir flood pool rise more than five feet over the multipurpose elevation of 706 ft. m.s.l.[8]

Cornwell next testified that the Highway 71 and railroad bridges on a worst case scenario, would have the effect of raising the water elevation at the Leeth property by approximately .3 ft. without regard to the depth of the flood pool at Truman Reservoir. Further, he testified that the Wilson levee, with a top of 749 to 751.8 ft. m.s.l. caused about 1.2 ft. of incremental backwater effect at the Leeth property. He also stated, in summary, that:

1. The three Kansas lakes, because they help to reduce the flows into Truman Reservoir, reduce the potential backwater effect on the Little Osage River and therefore directly benefit plaintiffs.

2. There is no direct day-to-day correlation between the Horton gauge and pool elevations at Truman Reservoir because of local rains which might cause the Horton gauge to go up while the Truman Reservoir level is declining and vice versa.

3. The Schell City gauge, however, because of it proximity to Truman Reservoir, does have a direct relationship to pool elevations at Truman Reservoir.

William L. Loucks, an expert in forest management and flood tolerances of trees, testified that above 725 ft. m.s.l. pecan trees (such as those on the Leeth property) would develop normally. He stated that this conclusion is supported by his examination of the Leeth property trees during a site visit and his recent observations of pecan trees on a site near the Schell–Osage area where the soil types are the same as those at the Leeth property. He observed that pecan trees at 722 ft. m.s.l. are doing

well but those at 718 ft. m.s.l. are suffering. Loucks further stated:

1. On the Leeth property he saw only one pecan tree under stress in an area which is presently being subjected to more standing water than when the tree grew to maturity, but all other pecan trees are healthy.

2. Other species of trees on the Leeth property, which include hickory, oak, elm, sycamore, hackberry, ash and maple, are also all healthy.

3. Tree stumps he has seen all had uniform rings of 3/16th of an inch in width indicating healthy growth.

4. Hallow or rotted insides of trees would not indicate water damage, but only that something had injured the tree during its life.

5. Although protracted flooding does injure trees by suffocating their root systems, such flooding does not cause rot.

6. "Cat faces" do not result in rot or staining.

7. "Blue staining" is caused by a fungus which enters exposed wood and usually forms on logs after they are cut.

8. Water, by keeping oxygen away from the fungus, decreases the growth of the fungus rather than encouraging its growth.

9. Floods which cover the foliage of trees can be injurious, but merely coverage of the soil surface at the base of trees does not significantly harm them.

10. Even 28 days of flooding would not have harmed the Leeth property trees because "their tolerance is much greater than that."

11. Certainly one extra day of flood elevation would make no difference to the Leeth property trees.

12. He saw no evidence of "water worm" or borer damage to Leeth property trees.

---

**8.** Cornwell said his calculations rounded down time factors of six hours or less, which means that six hours or less were not counted as one day, but rounded up as one day those time factors above six hours up to 30 hours. How-

ever, he said his methodology of rounding such hourly periods down and up is statistically acceptable and fair because on the average it would not favor either plaintiffs or defendant.

13. While seedlings are more susceptible to injury, whatever the cause of that injury, there is no evidence that the Leeth property trees, regardless of the season of the year, have been subjected to such severe flooding as to affect their health.

14. All of the Leeth property trees are experiencing "vigorous growth."

15. In his opinion logger McCoy could not have cut any trees on the Leeth property that had been damaged by high water.[9]

Michael Watkins, a wildlife biologist and a soil conservation expert for the Corps who is experienced in flood tolerance of crops, testified that the soils on the Leeth property could be classified into three types which are characteristic of bottom land soils in Missouri. He said that any crops on the Leeth property would have been destroyed by 19 days of natural flooding in 1982, by 14 days of natural flooding in 1985, and by 28 days of such flooding in 1986. Thus, he said that one extra day of flooding due to the backwater effect of Truman Reservoir would have made no difference whatever to plaintiffs' crops.

## DISCUSSION

■ Before any discussion of the merits of plaintiffs' claim, the court must first rule upon defendant's pending motions. Therefore, the first issue to be decided by the court is whether any of plaintiffs' respective claims, as defendant contends, are barred by a statute of limitations. The first statute cited is paragraph 1, Title 28 U.S.C. § 2501, which bars every claim in this court "unless the petition is filed within six years after such claim first accrues."

The second statute cited is paragraph 3, Title 28, § 2501, which provides:

A petition on the claim of a person under legal disability or beyond the seas at the time the claim accrues may be filed within three years after the disability ceases.

These statutes are jurisdictional. *Soriano v. United States*, 352 U.S. 270, 273, 77

S.Ct. 269, 271, 1 L.Ed.2d 306 (1957). Exceptions to the statutes are to be narrowly construed and applied only under the most compelling circumstances. *Bonen v. United States*, 229 Ct.Cl. 144, 150, 666 F.2d 536, 540 (1981), *cert. denied*, 456 U.S. 991, 102 S.Ct. 2273, 73 L.Ed.2d 1286 (1982). A claim accrues when "all events" have transpired that fix the Government's alleged liability, entitling the claimant to demand payment and sue in the Claims Court. *Nager Electric Co. v. United States*, 177 Ct.Cl. 234, 240, 368 F.2d 847, 851 (1966).

■ In a taking case involving an allegation that continual flooding of a claimant's property is the causative factor, the critical question which must first be answered is when the date of taking occurred. Establishment of that date depends on an analysis of the facts. Under the facts in this case it is clear that plaintiff Fred Leeth had some knowledge that Truman Dam could affect the Leeth property even before construction of Truman Dam began. He acquired additional knowledge as to a possible effect when he first visited Truman Dam in late 1979 and had a discussion with Corps officials regarding the extent of the flood pool. Although plaintiffs' answers to defendant's interrogatories without any modification or correction support defendant's contention that plaintiff had sufficient knowledge possibly after his first visit, but certainly after his second visit, to conclude that Truman Dam would have some harmful effect upon the Leeth property, Fred Leeth did convincingly modify those answers during the course of his trial testimony. The court is satisfied that based upon a careful review of his testimony, Leeth's second visit to the Corps' offices at Truman Dam, when he learned significantly more about the possibility of Truman Dam causing flooding at the Leeth property, actually did not occur in 1982 but in late 1983, a visit "triggered" by the flooding he saw during that year. The court recognizes that Fred Leeth for many

---

9. Loucks said borers are insects which get into the growing part of a tree but do not infest the decayed part of a tree. He testified that the various tree species on the Leeth property with respect to their tolerance of water, are generally classed as either tolerant or intermediate. He also said he had observed no significant sedimentation on the Leeth property which could have effected the Leeth property trees.

years had generally known that some degree of damage during flooding might accrue to the Leeth property attributable to Truman Dam. Actually, plaintiffs did not need Dr. Morris to do a definitive backwater study to tell them at least this much. However, it was not until Leeth had witnessed approximately 55 days of serious flooding in 1983 that he finally concluded that Truman Dam (under a backwater effect theory) had damaged and would continue to damage the Leeth property to such an extent that in his opinion a legally cognizable grievance existed from an uncompensated taking of property. Since Fred Leeth's complaint was filed on September 27, 1988, the court finds that that complaint, as to plaintiff Fred Leeth, was not barred by the six year statute of limitations. *United States v. Dickinson*, 331 U.S. 745, 748–49, 67 S.Ct. 1382, 1384–85, 91 L.Ed. 1789 (1947); *M.R.K. Corp. v. United States*, 15 Cl.Ct. 538 (1988).

■ Plaintiff Marie Leeth Jones, by plaintiffs' evidence, was not shown to be mentally incompetent at the time that suit was filed on September 27, 1988. However, she was not a party plaintiff at that time. She was made a proper party plaintiff only by an amended complaint filed April 11, 1990. Although there is some question with respect to the date that she became incompetent, the record shows that a conservator was appointed for her on April 6, 1989.[10] Because she was undeniably competent when the statute of limitations started to run in 1983, it continued to run and expired before she was made a party to this suit. *See also, Whitney's Adm'x v. United States*, 18 Ct.Cl. 19, 24

(1883). Unfortunately, a state court's determination of incompetency does not toll the running of the statute of limitations contained in 28 U.S.C. § 2501. *Goewey v. United States*, 222 Ct.Cl. 104, 612 F.2d 539 (1979).

The court finds, therefore, that plaintiff Marie Leeth Jones has failed to sustain her burden of proof of showing a tolling of the statute because of her incompetency at the time of accrual of her claim in 1983. Since the six-year statute of limitations has barred her claim in this court, this court is without jurisdiction as to her claim and has no choice but to order dismissal of her claim.

■ Plaintiff Vincent Leeth was born on November 8, 1968. Therefore, he reached his majority on November 8, 1986 in accordance with applicable law in the State of Missouri. Mo.Rev.Stat. § 507.115 (1989). Vincent Leeth must have filed his own complaint or joined in Fred Leeth's petition within three years of that date since that would have been the date when his disability of non-age ceased. However, he, too, was not made a proper party to this proceeding until April 11, 1990 or more than three years from the date he attained his majority. Under these facts, the court finds that Vincent Leeth's claim is barred by the applicable three-year statute of limitations. *See Soriano v. United States*, 352 U.S. 270, 273, 77 S.Ct. 269, 271, 1 L.Ed.2d 306 (1957); *Kendall v. United States*, 107 U.S. 123, 17 Otto 123, 2 S.Ct. 277, 27 L.Ed. 437 (1883).[11] The court will also order dismissal of Vincent Leeth's claim.[12]

10. Since the court has no other or more accurate date to select as the date for establishing her incompetency, it will use the April 6, 1989 date in its determination of whether the statute of limitations had run by the time she was made a party to this action.

11. Plaintiffs contend that their claims did not accrue as early as 1983 because Fred Leeth was waiting for the Corps to act on his informal requests for relief. However, the facts show that plaintiff Fred Leeth's earlier discussions with the Corps were nothing more than negotiations and did not toll the statute or start it running on a new period of limitation for any

of the plaintiffs. *Clifton Products, Inc. v. United States*, 144 Ct.Cl. 806, 169 F.Supp. 511 (1959); *La Font v. United States*, 17 Cl.Ct. 837, 843 (1989); *Cascade Development Co. v. United States*, 12 Cl.Ct. 587, 590, *vacated on other grounds*, 838 F.2d 1222 (Fed.Cir.1988).

12. Even if the court has incorrectly applied paragraphs 1 and 3 of the statute of limitations with respect to the claims of Marie Leeth Jones and Vincent Leeth, based upon the discussion which follows, such error by the court would not effect the court's ultimate conclusion respecting dismissal of their respective claims.

The next question presented is whether plaintiffs' evidence was sufficient to constitute a prima facie case of a taking and therefore sufficient to defeat defendant's motion for a directed verdict upon completion of plaintiffs' case in chief. The intermittent flooding complained of must be frequent, inevitably recurring and proximately result in substantial damage in order to constitute a taking. *Fromme v. United States*, 188 Ct.Cl. 1112, 1118, 412 F.2d 1192, 1196 (1969). Plaintiffs here have the burden of showing by a preponderance of the evidence that the Government's operation of Truman Dam is the direct and proximate cause of their flooding. *Baskett v. United States*, 8 Cl.Ct. 201, 225, *aff'd*, 790 F.2d 93 (Fed.Cir.1985), *cert. denied*, 478 U.S. 1006, 106 S.Ct. 3300, 92 L.Ed.2d 714 (1986). Each case must be determined on the basis of its peculiar facts. *Althaus v. United States*, 7 Cl.Ct. 688, 693 (1985); *Herriman v. United States*, 8 Cl.Ct. 411, 417 (1985).

Plaintiffs' expert hydrology witness, Dr. Morris, testified that he looked only at the 1986 flood and found approximately one additional foot of Truman Dam induced flooding at the Leeth property due to the backwater effect. He admitted that the determination of the backwater effect at a particular point is a highly sophisticated computation because of the many variables which must be taken into account, including, as pertinent here, the Marmaton River, the Osage River, the highway and railroad bridges over the Little Osage River at Highway 71, and other factors. In fact, Dr Morris' finding of only 1.1 ft. incremental elevation due to the backwater effect in 1986 was generally consistent with defendant's finding in its studies for that same year of .8 ft. of incremental effect (a difference of only .3 ft.). Moreover, Dr. Morris' testimony did not refute defendant's contention that Dr. Morris' study method, the partial duration method, was not significantly better than the annual maximum method used by defendant in its studies. His testimony also showed that this level of flooding was incremental to natural flooding. Dr. Morris' testimony, although competent and persuasive, simply fell short of convincing the court that past or future natural flood events have been and will continue to be of such increased elevation and duration due to the backwater effect of Truman Dam as to constitute a compensable taking of plaintiffs' property. In these circumstances the court finds that plaintiffs failed to show by Dr. Morris' expert testimony that lesser flood events of undetermined height and duration, whether occurring during 1986 or during other years after 1979 when construction of Truman Dam was completed, had resulted or necessarily would result in the future in any damage whatever to the Leeth property as a result of the backwater effect of Truman Dam. Without the advantage of supporting studies, Dr. Morris' opinion testimony respecting the likelihood and extent of such past or future damage from lesser flood events is mere supposition. Such speculative evidence cannot form the basis for a compensable taking claim.

The court has also carefully reviewed and considered all of the testimony of plaintiffs' lay witnesses. That lay witness testimony has been carefully summarized above. It would be needlessly duplicative to again detail such testimony in this opinion. However, it is clear that notwithstanding this testimony, the following general conclusions may be reached:

1. No specific increased flood levels may be attributed solely to the backwater effect of Truman Dam.

2. No erosion, drift, sedimentation or damage to trees and growing crops may be attributed to the backwater effect from Truman Dam.

3. The Leeth property has always been subject to a great deal of natural flooding which has been a major cause of plaintiffs' problems.

4. The Leeth property soils are wet soils which were reclassified and reassessed at a much lower value due to instructions from the State Tax Commission and not because of any perceived backwater effect from Truman Dam.

5. The Leeth property is relatively poorly drained, and little has been done to improve the property's drainage patterns during past years.

6. Clearance of the Lyon property to the north of the Leeth property has harmed plaintiffs' property by increasing the runoff it has historically sustained.

7. The five to six foot Wilson levee which parallels the eastern boundary of the Leeth property is significantly impeding the flow of flood waters in the Little Osage River flood plain at the Leeth property.

8. There are many causes of a backwater effect at the Leeth property including the constrictions caused by the Highway 71 and railroad bridges to the east of the Leeth property, drift from upstream, and other rivers flowing into the Little Osage River, all of which have nothing to do with the presence of Truman Dam.

9. Plaintiffs' property continues to support healthy tree growth in all species of trees notwithstanding the natural floods which almost annually inundate the property.

Without a doubt, plaintiffs in good conscience feel that Truman Dam is causing a materially harmful effect on their property due to a natural phenomenon—the backwater effect. However, their case rests largely on very limited expert testimony, a great deal of speculation, and the insufficiently supported perception of lay witnesses. Plaintiffs' evidence of a taking viewed in the framework of established legal precedents which this court is required to follow is either materially deficient or not persuasive. Therefore, the court has concluded that defendant's motion for a directed verdict is meritorious and must be granted as to plaintiff Fred Leeth, the only plaintiff whose claim is not barred by the applicable statute of limitations and with respect to which this court has jurisdiction.

### The Defendant's Case

■ Although the court will grant defendant's motion for a directed verdict, should the court be in error in its judgment as to the sufficiency of plaintiffs' case in chief, it will summarize and briefly analyze defen-

dant's evidence which in every key aspect supports the court's above stated conclusion with respect to the plaintiffs' failure to prove the existence of a compensable taking of plaintiffs' property caused by a backwater effect from Truman Dam.

The aerial photographs submitted by Georgie, show that construction of the Wilson levee east of the Leeth property completed prior to 1979, significantly reduced the flood plain available for the passage of flood waters on the Little Osage River from approximately 3600 feet to approximately 650 feet, and that the clearing of the Lyon property to the north of the Leeth property added to the quantity of rainfall which necessarily must drain onto the Leeth property which is primarily funneled into the Davis Slough. However, if the Davis Slough is already filled with water, runoff from the Lyon property would have no place to go except over the Leeth property to reach the Little Osage River. The six aerial photographs as well as Georgie's personal observations during a site visit demonstrate that the natural flooding the Leeth property has experienced in past years has been and continues to be exacerbated by these factors. Such causative factors simply cannot be ignored, but that is what plaintiffs would have this court do.

Also, Wisdom's expert testimony completely supported Georgie's conclusions respecting the effect of the Wilson levee. There can be no doubt that the Wilson levee and the highway and railroad bridges both create some degree of backwater effect. Further, for purposes of resolving the issues in this case the court is satisfied that the annual maximum method of analyzing frequency of flooding is just as valid a method as that selected by plaintiffs' expert, Dr. Morris. (Both methods arrived at approximately the same height estimate for the 1986 flood's backwater effect.) In fact, had the Corps used the partial duration method of analysis, any additional Truman Dam backwater effect would have been very limited while the amount of natural flooding would have doubled. While a lay person merely through observation can identify that a backwater effect is occur-

ring at a particular point, the source of that effect cannot be identified by that lay person because it would "look the same" regardless of its cause.

The court is also persuaded by Buehre's testimony that the 1986 flood was truly of monumental proportions, and that the Fulton gauge readings when carefully studied prove that there is a direct correlation between the Fulton gauge readings and the height of flood waters 30 miles downstream on the Little Osage River at the Leeth property. Moreover, none of the logging and farming problems testified to by plaintiffs' lay witnesses could have resulted from a Truman Reservoir caused backwater effect because during those particular years and periods they referred to, the Truman Reservoir flood pool was at such low levels no correlation is possible from a hydrologic standpoint.

Cornwell's testimony respecting the Corps' studies was particularly persuasive. It showed that:

1. Truman Dam has had no effect on the *frequency* of flooding of the Leeth property.

2. Upstream flooding caused by Truman Dam's backwater effect has generally been well within the established flowage easement level, 742 ft. m.s.l., which easement level resulted in the purchase of easements from all affected landowners including Judge Kelso.

3. Due to the large number of days of natural flooding of the Leeth property since construction of Truman Dam, the three days of additional flooding *duration* during the period studied—one day each in 1982, 1985 and 1986—and the additional height in 1985 and 1986 of .1 ft. and .8 ft., would have had no damaging effect over what would have occurred naturally.

4. The Highway 71 and adjacent railroad bridges by virtue of their combined backwater effects would have increased flood elevations on the Leeth property by approximately .3 foot, and the Wilson levee would have increased flood elevations on the Leeth property by approximately 1.2 feet, which increases are unrelated to any Truman Dam caused backwater effect.

5. Although, the Kansas lakes could harmfully affect the Leeth property, partly because the Marais de Cygnes can cause backwater up the Little Osage River, the Leeth property is potentially benefited to some small degree by the Kansas lakes because of the increased control those lakes give to the Corps over the Truman Reservoir flood pool.

6. The Leeth property frequently floods without regard to Truman Dam, any other federal lakes, or the backwater effects from any downstream cause due to large amounts of upstream rainfall in the Little Osage River basin.

Based upon defendant's expert testimony the court concludes that measured against the standard of frequent, inevitable recurrence needed to show the taking of a flowage easement, the plaintiffs' complaint is without merit. This is so because the "character of the invasion," which must be examined in inverse condemnation cases to determine the question of compensation, is far from sufficient to support plaintiffs' claim of a taking in this case. *R.J. Widen Co. v. United States,* 174 Ct.Cl. 1020, 1028, 357 F.2d 988, 993 (1966), citing *United States v. Cress,* 243 U.S. 316, 328, 37 S.Ct. 380, 385, 61 L.Ed. 746 (1917). Significant incremental or backwater effect upon flooding of the Leeth property attributable to Truman Dam since its completion in 1979 does not occur except in connection with a truly major flood event such as the 1986 flood which was a 500 year flood event. Yet even that event did not materially enhance the damage naturally caused by that flood. In fact, the Truman Dam caused backwater effect at the Leeth property is truly inconsequential particularly when compared to the many damaging natural flood events to which that property is almost annually subjected. Moreover, the very randomness of any backwater effect shows that any resultant incremental flooding is not of such inevitability that it could constitute a taking. *Gasser v. United States,* 14 Cl.Ct. 476, 496 (1988); *Herriman v. United States,* 8 Cl.Ct. 411 (1985); *United States v. Sponenbarger,* 308 U.S.

256, 266, 60 S.Ct. 225, 229, 84 L.Ed. 230 (1939).

In *Hendricks v. United States*, 14 Cl.Ct. 143 (1987), plaintiffs alleged a taking involving land only 48 miles downstream from the Leeth property. In finding no taking of the economic remainder of plaintiffs' flowage easement, the court remarked upon the extremely high levels of precipitation in the Osage basin which occurred in the 1982–1986 period, a period of direct involvement in this case. Unquestionably plaintiffs in this case, as in *Hendricks*, would have experienced significant flooding with or without Truman Dam.

The defendant's evidence convincingly demonstrated that plaintiffs' property has not suffered substantial damage as a result of the very limited incremental flooding which was due to Truman Dam. Pecan trees on the Leeth property have not been damaged at all by the rare and minimal incremental backwater flooding due to Truman Dam. The only pecan tree which Loucks saw during his site visit that was under stress was experiencing that stress due to a change in drainage which the court is satisfied is properly attributable to the clearing of the Lyon property to the north of the Leeth property. The soil types on the Leeth property coupled with flooding and poor drainage, leave little doubt that natural flooding alone would have destroyed all crops in the years 1982, 1985 and 1986 and that any backwater caused flooding as a result of Truman Dam would not have significantly increased that damage.

Finally, the court had the advantage of its own rather extensive view of plaintiffs' property during a site visit on the day preceding commencement of trial in this case. Due to the efforts of Fred Leeth and the Corps, the court was able to view many of the significant areas both on and off the Leeth property including those field and forest areas which are the most subject to flooding, the southern border of the Leeth property, the Davis Slough, the Wilson levee, the county bridge, the Highway 71 bridges and the railroad bridges. The court saw no areas on the Leeth property which were exhibiting sedimentation or tree damage. In fact, the court saw no dead trees or even any trees under stress. Although the court saw some bank erosion on the Little Osage River, that erosion appeared to be due more to the swift flow of the river rather than to any other specific cause. The court saw no significant inland soil erosion, sedimentation or damage due to drift regardless of cause. In every aspect, the court's site visit confirmed the truth and accuracy of the testimony of defendant's witnesses and repudiated the conclusory evidence of plaintiffs' witnesses both with regard to causation and damage.

## CONCLUSION

All but Fred Leeth's claim are barred by the statute of limitations and must be ordered dismissed for the court's lack of jurisdiction over those claims. With respect to Fred Leeth's claim, the plaintiffs' evidence was insufficient to withstand defendant's motion for a directed verdict. Therefore, that motion is granted. However, if the court's partial granting of defendant's jurisdictional motion and granting of defendant's motion for a directed verdict are determined to be in error, in any event, the evidence submitted by defendant, when considered with that derived from the court's own site visit, inescapably leads to the conclusion that plaintiffs have, or plaintiff Fred Leeth has, failed to prove by a preponderance of the evidence that a taking of property has occurred which would warrant an award of damages in this case. Accordingly, defendant must prevail. The Clerk is instructed to dismiss the complaint. No costs.

IT IS SO ORDERED.